David **LEUCH**, Appellant,

v.

**STATE of Alaska**, Appellee.

No. 5255.

Supreme Court of Alaska.

Sept. 25, 1981.

---

David C. Backstrom, Deputy Public Defender, Fairbanks, for appellant.

Bill D. Murphree, Asst. Dist. Atty., and Harry L. Davis, Dist. Atty., Fairbanks, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Chief Justice.

David Leuch pled guilty to two counts of grand larceny. The superior court imposed concurrent sentences of eight years with four suspended. Leuch now appeals this sentence, claiming it is excessive.

The offenses to which Leuch and his co-defendant, Michael Darr, pled guilty involved the theft of two motorcycles from the Fairbanks Harley-Davidson dealership and the theft of a safe, a dolly, and approximately $12,000 from the Healy Roadhouse on the Parks Highway.[1]

---

1. Both were also charged with an additional count of grand larceny, three counts of burglary not in a dwelling, and one count of concealing stolen property, and Darr was charged with

The presentence report on Leuch's background shows that he grew up in a "stable, loving environment" with his adoptive parents in California. During that time, he graduated from high school, having participated in the tennis and music programs and served as class president. He attended college for a time, but his grades show that he was a poor student at this level.

In 1975, having taken a three-month course in truck driving, Leuch began to drive a truck cross-country. In 1976, he worked for a few months for a Manpower program in Denver, Colorado, then came to Anchorage in June of 1976 to find a trucking job. For three months in 1977, he was employed as a driller's helper. From June of 1977 to February of 1979 he worked as a cab driver, leasing his own taxi for the last nine months of that time.

His criminal record up to that point consisted only of several traffic offenses. On February 14, 1979, however, he was convicted of twenty-six counts of unemployment fraud, for which he was given a ninety-day sentence with all but fifty-four suspended, together with a fine of $260, and was required to make restitution in the amount of $1,274.[2]

It was during this initial incarceration on the unemployment fraud charges that he met his co-defendant Michael Darr. After their release, the two traveled to Fairbanks together purportedly intending to file on a gold claim of Darr's. Upon their arrival in Fairbanks, their truck broke down. They tried to spend the night in the truck until it got too cold, according to Leuch, and then they entered a church (unlocked, by Leuch's account) which apparently led to their conviction in Fairbanks on June 12 of petty larceny and unauthorized entry.[3] Leuch

was given ten days in jail. During that time, he apparently injured his knee, was hospitalized for surgery on some torn cartilage in that knee, and later convalesced at Careage North a convalescent home in Fairbanks. There he met a health care assistant who, presumably concerned about the fact that he knew few people in Fairbanks apart from Darr, allowed Leuch to reside with her until he was able to find suitable work.

The theft of the motorcycles was, in Leuch's words, sheer impulse on his part; he indicated that Darr, who had been considering the act for a couple of weeks, suggested it. They went to the motorcycle store; Leuch broke a window with a rock; Darr climbed through the window and opened the door; and each removed a motorcycle which they stored at a friend's cabin.

The Healy Roadhouse theft was to get money to ship the motorcycles out of the state. The health care assistant with whom Leuch was residing had a friend who had formerly been employed at the Roadhouse and apparently had a grudge against its owner. This friend supplied Darr and Leuch with the floor plans of the Roadhouse to enable them to locate the safe. Darr and Leuch, having planned the venture for two weeks in advance, broke in by unscrewing a single bolt lock on the back door. They then found a dolly and used it to to remove the safe, taking both safe and dolly in a station wagon to a dirt road off Chena Pump Road. They broke into the safe and found about $7500 cash, along with numerous checks and notes which they burned.[4] They then dumped the safe into the river.

---

an additional count of receiving stolen property. The state argues that these additional counts "cannot be overlooked," forcing us to repeat once again that, absent a conviction, an indictment is absolutely no evidence of guilty conduct. *Waters v. State*, 483 P.2d 199 (Alaska 1971).

**2.** On November 15, 1979, Leuch admitted failure to make restitution on this charge, and was sentenced to an additional 30 days in jail.

**3.** We cannot tell from the record whether these convictions were based on the entry into the church or on another incident.

**4.** Appellant asserts that the amount which the owner of the Healy Roadhouse stated was in the safe ($16,000 in currency and checks) does not square with the amount of money Leuch

Leuch's letter explaining the incidents expressed his remorse over the harm caused the victims by his actions.[5] He stated that he had been in a depressed state of mind during his recuperation, and that he was too easily influenced by his companions.

Letters on Leuch's behalf were submitted from Leuch's girlfriend, opining that Leuch, being new to Fairbanks, had been unduly influenced by his relationship with Darr, whom she had known for a long time and regarded as "bad company"; from his girlfriend's mother, stressing that she would continue to accept him into her home and endeavor to provide a positive influence; and from Leuch's parents, stating that Leuch's criminal activity came as a shock to them and that they were sure he would never engage in criminal behavior again. An institutional counselor in Anchorage indicated that Leuch had adjusted well to incarceration and was in the less secure section of the jail.

The probation officer preparing the presentence report noted that Leuch was the product of a stable home environment; that he appeared to be a dependable worker; that he was cooperative during the interview; and that he appeared to feel remorse for his actions. Although Leuch used alcohol and drugs (marijuana and occasionally cocaine), they were not a factor in the of-

fenses. The probation officer attributed Leuch's criminal conduct to several factors: the fact that Leuch was an impulsive individual [6] with poor judgment, especially with respect to choosing his associates; his lack of employment and poor financial situation; his lack of discipline and structure in goal orientation; and his lack of familial ties in Alaska, where he apparently plans to reside. The probation officer noted that Leuch stated he had two job offers, one as a trucker north of Fairbanks and the other as a laborer in a cannery in Dutch Harbor. The probation officer did not, however, regard either of these opportunities as a viable job plan. The presentence report concluded by recommending incarceration, in view of the seriousness of the offenses and the large amounts of money involved, and the fact that Leuch had apparently not learned from his prior contacts with the criminal justice system.

At the sentencing hearing, the prosecutor apparently ignored his agreement with Leuch's defense counsel to bring to the court's attention Leuch's cooperation with the state in offering to testify against Darr, and this was pointed out by defense counsel.[7] It was also brought out that Darr, learning of Leuch's cooperation, had made statements indicating that he intended to retaliate physically against Leuch.[8]

---

said was in the safe when it was torn open ($7,500 in cash). However, Leuch also stated in his letter to the court that he and Darr burned the checks and notes they found in the safe, which accounts for any discrepancy.

5. His letter said:

I know that when I had the money and the motorcycles I felt guilty and trapped and had the empty and insecure feeling of knowing they didn't belong to me. It feels good to have something that you make for yourself and pretty bad if someone takes it away from you. I can assure you that I am truly sorry about the events that took place and to the people I offended!

6. Although the theft of the motorcycles was apparently impulsive on the part of Leuch, the theft of the safe, as the probation officer pointed out, was a deliberately planned act.

7. The state notes that Leuch is not claiming that he did not receive the benefit of this or any

other concession expected. We agree, and this aspect of the case is not before us here.

8. The record contains a transcript of an interview between one of the investigators on the case and an inmate who had overheard Darr talking about the offense. The primary content of the transcript concerns Darr's statements incriminating himself in the motorcycle and safe thefts. At the end, the following fact came to light:

Q. Can you think of anything else?
A. Ah . . . The only thing I can think of is that . . . [Darr] does, that he does intend to, to settle it with David Leuch in the event that something physically does happen to David Leuch by him that he did have intent previous to that of doing something to him.
Q. What you're trying to say is that ah, he is upset with David Leuch? Why is that?
A. I think he's more or less upset with David Leuch because ah, he refers to it as snitching but—he has reason to believe that

The superior court did not find Leuch to be the worst offender within the class, but found the question a close one. The court stated that although this was Leuch's first felony offense, his misdemeanor convictions showed extreme dishonesty, and that he was on his way to becoming a professional criminal. But the court also noted that, to Leuch's credit, he had admitted his participation and that his attitude in jail appeared to be good. The superior court assessed the *Chaney* factors[9] as follows: Leuch's chances of rehabilitation were greater than those of Darr, which were described as "slim"; there was also a little higher likelihood that Leuch would be deterred by a sentence than in the case of Darr, where the likelihood was "not that good"; the necessity of isolation for the protection of the community was high; and the extent of community condemnation was also high. The superior court also expressed the view that the deterrent effect of a sentence on the general community is negligible in practically any case because, in the superior court's view, sentences are not sufficiently publicized to have any significant impact. The court's main concern was the proximity of this offense to Leuch's two prior jail sentences, which precluded a suspended sentence. The court then imposed the concurrent eight year sentences with four years suspended.

We will modify a sentence only if, after an independent review of the record, we conclude that the superior court was clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974). In reviewing a sentence, a portion of which is suspended, the period of suspension as well as the period of incarceration must be weighed. It would, of course, be unrealistic to consider the suspended time to be as harsh a sanction as time to be served in prison. However, it would also be incorrect to consider suspended time as a nugatory or insignificant sanction. Thus, this appeal involves concurrent eight-year sentences four years of which have been suspended. We have previously indicated that, except for cases involving particularly serious offenses, dangerous offenses, and professional criminals, maximum sentences ought not to exceed five years. *Donlun v. State*, 527 P.2d 472, 475 (Alaska 1974).

We are in general agreement with the position of the ABA Standards that, in the absence of affirmative reasons to the contrary, a sentence not involving confinement is to be preferred.[10] "Affirmative reasons

David Leuch snitched on him for, for ah, getting a lesser sentencing in his particular crime . . . and then being transferred to a different . . . incarcerated area, he has reason to believe that there was more or less foul play on David Leuch's part.

Q. OK. So in other words, he may try to, to get back at David Leuch if possible in some manner?

A. Ah, I have reason to believe that ah, psychologically that ah, Mr. Darr, ah, shows signs of rebelliousness, ah, not just to his other inmates but to the guards and so forth and that I would not put it past ah, his particular situation to want to do bodily injury to David Leuch.

**9.** In *State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970), we said:

Under Alaska's Constitution, the principles of reformation and necessity of protecting the public constitute the touchstones of penal administration. Multiple goals are encompassed within these broad constitutional standards. Within the ambit of this constitutional phraseology are found the objectives of rehabilitation of the offender into a non-

criminal member of society, isolation of the offender from society to prevent criminal conduct during the period of confinement, deterrence of the offender himself after his release from confinement or other penological treatment, as well as deterrence of other members of the community who might possess tendencies toward criminal conduct similar to that of the offender, and community condemnation of the individual offender, or in other words, reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves. [Footnotes omitted.]

**10.** The ABA Standards Relating to Sentencing Alternatives and Procedures § 2.3(c) (Approved Draft 1968) states: "A sentence not involving confinement is to be preferred to a sentence involving partial or total confinement in the absence of affirmative reasons to the contrary." Section 2.4(c) of the same document indicates that "[a] sentence involving partial confinement is to be preferred to a sentence of total confinement in the absence of affirmative reasons to the contrary."

to the contrary" should be found on the basis of a showing that probation, or some other alternative to incarceration, is inadequate to serve one or more of the *Chaney* criteria. The ABA Standards list the following legitimate reasons for the selection of total confinement:

(i) Confinement is necessary in order to protect the public from further criminal activity by the defendant; or

(ii) The defendant is in need of correctional treatment which can most effectively be provided if he is placed in total confinement; or

(iii) It would unduly depreciate the seriousness of the offense to impose a sentence other than total confinement.

ABA Standards Relating to Sentencing Alternatives and Procedures § 2.5(c) (Approved Draft 1968). The Standards go on to specify that "[o]n the other hand, community hostility to the defendant is not a legitimate basis for imposing a sentence of total confinement." *Id.* We read these considerations as corresponding to the *Chaney* criteria of isolation, rehabilitation, and community condemnation. We also think that a finding that a non-custodial sentence would fail to deter the defendant and/or others to the requisite degree, the other factors in the *Chaney* list, justifies a sentence of incarceration. These "affirmative reasons to the contrary" should have some basis in the record.

■ A significant indication that a non-custodial sentence is inappropriate would be

a past history of unsuccessful attempts at such sentences. If an individual has not proven amenable to parole or probation in the past, it is likely that, absent some change, he will not prove to be so in the future.[11]

A lack of information which stems from the absence of any experience as to how the offender will perform on probation renders it especially difficult to make any judgment as to three of the *Chaney* factors: the need to deter the offender, the need to isolate the offender, and the offender's amenability to the rehabilitative process. On the other hand, it is clear from Leuch's record that a pattern of short incarcerations followed by unsupervised release has been insufficient to protect the public, to deter Leuch himself, or to assist him in rehabilitating himself.

The preference for non-incarcerative sanctions may be overridden, even if information is lacking regarding their past use in terms of the above three factors, by the other *Chaney* considerations, general deterrence and community condemnation, which are not as closely tied to information regarding past performance on probation programs.

Here, the superior court opined that the general deterrence factor played little or no role.[12] The community condemnation factor, however, was regarded as significant by the superior court.

To the extent that this policy is inconsistent with the presumptive sentences laid out in the new criminal code or the sentencing guidelines proposed by the Sentencing Guidelines Committee, the latter are to prevail. For most first offenders, however, these guidelines leave the choice between probation and short periods of incarceration open.

11. This policy is also reflected in the new statutory sentencing provisions. AS 12.55.015(b) reads:

The court, in exercising sentencing discretion as provided in this chapter, shall impose a sentence involving imprisonment when

(1) the defendant deserves to be imprisoned, considering the seriousness of his present offense and his prior criminal history, and imprisonment is equitable consider-

ing sentences imposed for other offenses and other defendants under similar circumstances;

(2) imprisonment is necessary to protect the public from further harm by the defendant; or

(3) sentences of lesser severity have been repeatedly imposed for substantially similar offenses in the past and have proven ineffective in deterring the defendant from further criminal conduct.

12. The superior court was of the view that whatever sentence was imposed would have little or no impact on the community in general, as sentencings are regarded by the news media as insufficiently newsworthy to receive adequate publicity.

In light of the fact that the community condemnation factor has been the cause of some concern in this and other recent cases, we think a discussion of this sentencing factor is appropriate.

We recently discussed the community condemnation factor in *Kelly v. State*, 622 P.2d 432, 435–36 (Alaska 1981). There we emphasized that community condemnation is a different concept from general deterrence, a separate sentencing goal under *Chaney*, and from retribution, an impermissible consideration in sentencing.

Many theoretical explanations of this concept have been put forward, all of which are useful in understanding why this aspect of *Chaney* is to be retained in sentencing decisions. The Kantian view is that each member of society is granted certain benefits, and agrees to subject himself to certain restraints so that other members of society may enjoy these same benefits. When an individual ignores these restraints, he achieves an unfair advantage over other members of society by avoiding his obligations while continuing to enjoy his benefits.

According to Kant, restoration of the balance on which society depends requires that such an individual be deprived of those benefits to some extent.[13] Oliver Wendell Holmes believed that, since society has required individual victims to set aside their tendency toward private vengeful action in favor of societal remedies against the offender, society must punish the offender on behalf of the victim or else risk a return to private methods of forcing the offender to suffer.[14] More recently, concern over the disparity in sentences under rehabilitation-oriented systems has led to the conclusion that some notion of just punishment must be included in sentencing considerations.[15]

 Theoretical justifications are of limited value in the difficult sentencing decision itself in a particular case. Our decisions have not provided the internal structure which is necessary to implement this concept in sentencing decisions. We have been reluctant to provide this structure ourselves because judgments as to the extent to which the community condemns a partic-

---

**13.** *See* J. Murphy, Kant: The Philosophy of Right 109–12, 140–44 (1970).

**14.** O. W. Holmes, The Common Law 36 (Howe ed. 1963). *See also* Weiler, *Why Do We Punish? The Case for Retributive Justice*, 12 U.B. C.L.Rev. 295, 308 (1978):

> Sir James Stephen, the famed Victorian jurist and historian of criminal law once said, '[t]he criminal law stands to the passion of revenge in much the same relation as marriage to the sexual appetite.' He believed that authoritative punishment of criminals was a desirable institution because it provided an orderly outlet for emotions that would otherwise express themselves in socially less acceptable ways. If the state did nothing about punishing an offender, the natural and potentially destructive feelings of resentment aroused in victims of the offence or other interested parties would no doubt result in attempts at private vengeance.

**15.** *See* Morris, *The Future of Imprisonment: Toward a Punitive Philosophy*, 72 Mich.L.Rev. 1161, 1173 (1974):

> No sanction greater than that 'deserved' by the last crime, or series of crimes, for which the offender is being sentenced should be imposed. The principle strikes directly at the larger question I have deferred, namely, why not hold all convicted criminals until risk of recidivism is past? My answer, in part, is

> that the link between established crime and deserved suffering is a central precept of everyone's sense of justice, or, more precisely, of everyone's perception of injustice. To use the innocent as a vehicle for general deterrence would be seen by all as unjust, although it need not be ineffective if the innocence of the punished is concealed from the threatened group. Punishment in excess of what the community feels is the maximum suffering justly related to the harm the criminal has inflicted is, to the extent of the excess, a punishment of the innocent, notwithstanding its effectiveness for a variety of purposes.

> Compelling reasons for accepting a notion of just punishment are explained thoroughly and intelligently in several recent works on sentencing theory and proposals, which we commend to sentencing courts and others interested in sentencing. *See* A. von Hirsch, Doing Justice: The Choice of Punishments, Report of the Committee for the Study of Incarceration (1976); Weiler, *Why Do We Punish? The Case for Retributive Justice*, 12 U.B.C.L.Rev. 295 (1978). *See also* A. Dershowitz, Background Paper to Fair and Certain Punishment, Report of the Twentieth Century Fund Task Force on Criminal Sentencing (1976); M. Frankel, Criminal Sentences: Law Without Order (1973).

ular offense are more properly made in the legislative area than by the judiciary. The new criminal code with its sentencing provisions provides this structure for most crimes, and should be of immense guidance to sentencing courts. One principle which emerges, both from our prior case law and from the new criminal code, is that offenses which are committed solely against property or the public order are, on the whole, less severe than offenses involving threats, injuries, or death, or other invasions of another's person. We have emphasized this factor in several of our prior decisions,[16] and it is also inherent in several aspects of the new code.[17]

This is congruent, not only with the theoretical justifications noted above, but also with common-sense notions of reprehensibility. In Kantian terms, the imbalance which is solely one person's wrongful loss of property and another's wrongful gain is more easily righted than the imbalance which involves the victim's loss of life, limb or dignity. Under the Holmes view, society can fulfill its obligation to the victim of a purely financial loss with less drastic means (ideally, restitution) than in the case of a victim of a physical assault. In common-sense terms, the harm imposed on the victim of a financial loss is generally much less

injurious, degrading and painful than the harm stemming from a personal threat or physical injury.[18] Yet another relevant aspect of purely property crime is that the remedy of restitution can approximate the "making whole" of a victim in this context in a way which it cannot in the context of crimes involving physical threats or invasions of a victim's person.[19]

■ This is not meant to indicate that the loss occasioned by property crimes is an insignificant one, or that it should be disregarded, or that it can never result in incarceration. We do think, however, that the extent of harm visited upon the victim by the offender is a proper consideration at sentencing, and that the proper *Chaney* vehicle for this consideration is the community condemnation factor.

■ Taking all these factors into account, we think that where an offense is against only property, involving no physical threats or violence; where it is the offender's first felony conviction; and where there is no background of unsuccessful paroles or probations which would indicate that probation is unsuitable to protect the public, to deter the offender, and to further his rehabilitative progress, probation, coupled with restitution,[20] is the appropriate

16. *See, e. g., Black v. State*, 569 P.2d 804, 805 n.6 (Alaska 1977); *Andrews v. State*, 552 P.2d 150; 154 (Alaska 1976).

17. Generally, offenses against the person (chapter 41 of Title 11) carry higher sentences than offenses against property (chapter 46 of Title 11). Additionally eight of the eighteen aggravating factors listed in AS 12.55.155(c) involve potential physical injury (subsections 1, 2, 4, 5, 6, 8, 12, and 18) as a part of the present offense or the offender's record.

18. *Cf.* W. Shakespeare, Othello, Act III, Scene iii, lines 157–61:
Who steals my purse steals trash—'tis something, nothing,
'Twas mine, 'tis his, and has been slave to thousands—
But he that filches from me my good name
Robs me of that which not enriches him
And makes me poor indeed.

19. Again, we find significance in the new legislative enactments which give a greater role to restitution in the sentencing provisions:

The Code gives greater emphasis to restitution than is the case under existing law. Restitution is available in *all* cases and in connection with most kinds of sentences. As it now stands, only passing reference is made to restitution in AS 12.55.100(a)(2), where it is listed as a possible condition of probation.

. . . .

Further, because restitution is the one sanction which has the potential for making a victim 'whole,' or nearly so, and because the victim is the most frequently ignored party in the justice system, the Subcommission felt that restitution should be given more extended treatment as a complementary sanction in the Revised Code.

Criminal Code Revision Subcommission, Alaska Criminal Code Revision, Commentary to ch. 36, art. 6, at 54 (Tent. Draft, Part 6, 1978).

20. The probation officer in the instant case noted that Leuch did not have the financial resources to make restitution. We do note that, generally, an offender will be in a better position to make restitution while in the com-

sentence unless other factors militate against it.[21] Naturally, this is not to be construed as a hard and fast rule.

 Here, several factors are present which would justify a departure from this general rule. Although these were Leuch's first felony convictions, he had a record of numerous misdemeanors which the sentencing judge found had involved "extreme dishonesty"; although there was no background of supervised probation, there was a failure to make restitution for the prior offenses; and although the offenses in question here were solely against property, one of the felonies was a large-scale crime and had a severe impact on the uninsured victim. COnsequently, the community condemnation factor must be placed on the upper end of the spectrum for property crimes. Thus, we are unwilling to hold that the general rule articulated above must be applied literally in the case at bar. Therefore we think the sentencing court was correct in concluding that some period of incarceration was appropriate. We think the court was clearly mistaken, however, in imposing concurrent sentences of eight years with four suspended. Given the circumstances of this case we think the superior court was clearly mistaken in imposing a total sentence which exceeded five years.[22] In short, we hold the sentence is excessive and that upon remand appellant should receive concurrent sentences which, including any period of suspension and probation, do not exceed five years in total length.

---

munity than while incarcerated. Also, the statute is designed to permit the imposition of restitution without creating undue financial burdens on the offender or his dependents, a concern to which the court should give weight in cases arising before the application of the new statutory provisions. Further, the financial inability of an offender to make restitution should not be regarded as a factor favoring a sentence of incarceration.

21. It was while serving his initial sentence for his prior misdemeanors that Leuch met Darr, striking up a relationship which has led to nothing but trouble for both and for their innocent victims. Given the probation officer's opinion that there was a direct correlation between Leuch's criminal behavior and his peer group association, Leuch's own admission that he was unduly influenced by Darr, and Leuch's girlfriend's statements that Leuch, who was new to Fairbanks, had erred in regarding as his friend such "bad company" as Darr, the only possible conclusion is that Leuch's prior incarceration had a net impact of furthering his criminal career. This is a classic illustration of the counter-productive effect which incarceration can have.

Cf. G.B. Shaw, The Crime of Imprisonment 32–33 (Citadel ed. 1961):
He is, at the expiration of his sentence, flung out of the prison into the streets to earn his living in a labor market where nobody will employ an ex-prisoner . . . . He seeks the only company in which he is welcome: the society of criminals; and sooner or later, according to his luck, he finds himself in prison again. . . . The criminal, far from being deterred from crime, is forced into it; and the citizen whom his punishment was meant to protect suffers from his depredations.

Obviously, we do not mean to intimate that incarceration always has this effect, or that the end result is solely caused by the incarceration rather than by the offender's exercise of free will. The pattern here, however, is too striking for us not to notice it.

22. Under the new criminal code, Leuch's offenses would be classified as Theft in the Second Degree, a class C felony. AS 11.46.130. Under that statute, no presumptive sentence is given for first offenders, but we note that the maximum sentence would be five years, the presumptive sentence for a second offender two years, and the presumptive sentence for a third offender three years. AS 12.55.125(e).

The Sentencing Guidelines Committee's current recommendations as to first offenses, which had not been promulgated as of the time sentence was imposed in this case, coordinate well with this statutory scheme. For this particular class C felony, the presumptive sentence under those recommendations for a first offender is probation, with up to sixty days incarceration. The presence of aggravating factors (including a history of misdemeanor convictions involving fraud, theft, or violence), to be specified by the sentencing judge, may support any sentence between sixty days and two years. A sentence in excess of two years (which would exceed the presumptive sentence for second offenders) should not be imposed unless the court finds on the basis of clear and convincing evidence that manifest injustice would result from the imposition of a sentence of two years or less, and the "extraordinary" circumstances necessary to support this finding are to be specified in the record.

MATTHEWS, Justice, with whom BURKE, Justice, joins, dissenting.

In view of the fact that the defendant had been twice incarcerated for two separate crimes not long before he committed the two felonies of which he now stands convicted, and in view of the premeditated nature of the theft of the safe, I am unable to say that the trial court was clearly mistaken in imposing concurrent eight year sentences with four years suspended.