Terry R. DORRIS, Appellant,

v.

STATE of Alaska, Appellee.

No. 5947.

Court of Appeals of Alaska.

Dec. 30, 1982.

James M. Hackett, Fairbanks, for appellant.

James P. Doogan, Asst. Dist. Atty., Fairbanks, Peter A. Michalski, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

OPINION

Before BRYNER, C.J., SINGLETON, J., and CARLSON, Superior Court Judge.*

SINGLETON, Judge.

On November 21, 1979, a grand jury in Fairbanks returned a fifty-six count indictment against Terry Dorris. Twenty-eight counts charged separate residential burglaries, the remaining counts charged related crimes. Dorris pled no contest to nine of the burglary counts and to a separate count charging malicious destruction of property. In return, the state dismissed the remaining counts and stipulated that Dorris could appeal an order denying his motion to suppress certain evidence. The state concedes that if Dorris prevails on appeal, all charges will have to be dismissed. We therefore have jurisdiction to consider this appeal. *Oveson v. Anchorage,* 574 P.2d 801 (Alaska 1978); *Cooksey v. State,* 524 P.2d 1251 (Alaska 1974).

Dorris makes three arguments on appeal: (1) that Dorris was stopped by state troopers without reasonable cause; (2) that affi-

---

* Carlson, Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

davits for search warrants contained material misrepresentations; and (3) that the court improperly ordered restitution and impermissibly increased Dorris' sentence by imposing a fine after the sentence had become final. We affirm the conviction.

On November 6, 1979, Terry Dorris was driving along a highway near Fairbanks, in his black, 1977, Chevrolet pickup truck, accompanied by his black Labrador retriever. He pulled to the side of the road and exited his vehicle. Alaska State Troopers Samuel Barnard and James McCann were following Dorris in an unmarked police vehicle. They stopped directly behind him, activated their flashing lights, exited their vehicles, and with weapons drawn faced Dorris as he exited his vehicle.

The following facts explain the troopers reasons for stopping Dorris. Between October 30, and November 6, 1979, six residential burglaries which had a number of common characteristics were reported to the state troopers in Fairbanks. Each burglary occurred in a small area northwest of the city bordering the campus of the University of Alaska. Each of the burglaries occurred on work days during daylight hours. At each residence the burglar took guns and, most significantly, used a truck with wide tires arranged in a distinctive pattern. Three tires had an identical tread design, but the left rear tire had a dissimilar tread design. Tire tracks with this distinctive pattern were found at each of the burgled residences. On one occasion, the burglar repeatedly discharged a firearm inside a burgled residence without apparent explanation.

Inspector Steven Heckman was dispatched to the area in question to investigate the sixth burglary on November 5, 1979. While at the scene, Heckman learned that Denise Johnstone, a neighbor, might have seen the burglar's vehicle. He went to her residence and interviewed her. Ms. Johnstone told Heckman that she observed a short-bed pickup truck suspiciously enter her driveway, turn around, and leave somewhere between 10:00 a.m. and 2:00 p.m. on November 5, 1979. She described the vehi-

cle as a black Ford or GMC pickup truck with little chrome, no noticeable damage, and no camper shell. She was not sure whether it was four-wheel drive though she thought it was set high off the ground.

Ms. Johnstone did not notice the truck's tires but when Heckman went to the place in Johnstone's driveway where she said the truck had turned around, he found tire tracks in the snow exhibiting the distinctive pattern found at the site of each of the six burglaries.

Johnstone was not able to see clearly into the cab of the truck. She did notice a "real large" dog, weighing about 100 pounds, which she described as dark brown with short hair, short pointed ears, and a square muzzle, in the cab on the passenger side. She did not get a good look at the driver but, based on his size, believed he was a man with hair that bushed out from under a stocking cap. She did not know his race.

Heckman repeated Johnstone's comments at a morning briefing at the Fairbanks detachment of the state troopers on November 6, 1979. Those present were notified of Johnstone's report, including her description of the suspect, the vehicle, and the dog. They were also advised of the burglar's method of operation, the distinctive pattern of tire treads, the common theft of firearms, and the burglar's use of firearms to "shoot up" one of the burgled houses. The troopers determined to place the area in which the burglaries occurred under surveillance. Individual troopers were assigned to designated surveillance areas in northwest Fairbanks with instructions to be on the lookout for the suspect vehicle.

After attending a class at the University of Alaska on November 6, 1979, Troopers Barnard and McCann drove a short distance to a golf course parking lot at the intersection of Yankovitch and Ballaine Roads, within the area under surveillance, where they took up a position. Shortly before noon, after waiting approximately an hour and a half, they spotted a dark-colored pickup truck traveling west on Farmer's Loop Road; there was a large dog in the back of

the truck. This was the first vehicle they had seen that matched Johnstone's description. While the troopers did not know Dorris or his vehicle at that time, Dorris was driving the pickup truck. The troopers followed the truck through the University area and on to the Old Nenana Highway. Approximately one mile beyond Sheep Creek Road, the troopers lost sight of Dorris' vehicle. As they passed a private residence, later identified as the Palczer residence, they noticed the subject vehicle parked in the driveway. The driver was gone but the large dog remained in the back of the truck. Barnard and McCann drove 200 yards up the road and parked along the side of the road so that they could survey the driveway. They waited for five to ten minutes and then drove past the driveway, observing that the truck remained parked in the driveway. Barnard and McCann waited an additional five minutes and then drove past the driveway again and saw that the truck was gone. Since the truck had not traveled toward them, they proceeded in the opposite direction along the Old Nenana Highway and spotted it traveling west.

When Barnard and McCann first noticed Dorris parked in the driveway of the Palczer residence, they thought he might be a resident home for lunch or, since they spotted a for sale sign at the foot of the driveway, that he might be a real estate agent checking the premises. During his observations, Barnard concluded that the driver did not live there. He relied on the following factors in arriving at this conclusion. First, he thought fifteen minutes was an unusually short time for lunch, but too long for a brief stop to retrieve a forgotten article. Second, he noticed that the dog remained in the truck while it was parked. He reasoned that the owner would have let the dog out if he lived there. Finally, he concluded that the truck was not parked in front of the garage where one would expect an owner or visitor to park, but some twenty feet away from the house. By this time Barnard felt he had located the burglar and, by implication, that the Palczer house was being burglarized.

Barnard therefore radioed Investigator Heckman to go to the Palczer residence and determine whether it had been burglarized. Heckman did so and confirmed that the vehicle observed in the Palczer driveway left tracks matching those found at the burglarized residences. Heckman's radio malfunctioned, however, preventing him from communicating this information to Barnard. Heckman initially found no evidence of forced entry and did not confirm that a burglary in fact took place until he had consulted with other troopers and entered the residence through an unlocked door, approximately forty minutes later. By the time Heckman confirmed that a burglary had occurred, Dorris had already been arrested.

In the meantime, Barnard and McCann followed Dorris as he drove along the Old Nenana and Parks Highways. Eventually, Dorris drove around a corner and then abruptly pulled to the side of the road. Barnard testified that Dorris' actions created a quandry. He believed Dorris had discovered that McCann and Barnard were following him. Barnard therefore had three options:

> I can drive on by the vehicle, hoping that he doesn't know I'm a policeman . . . stop behind the vehicle . . . it would be a pretense to see if he had problems with his vehicle . . . . Or I could stop him and approach him with the attitude that I thought that he was responsible for some crime, which I thought he did.

McCann and Barnard pulled over behind Dorris, engaging in the conduct which Dorris challenges in this appeal. Barnard examined the truck tires and observed that they were very, very similar to the diagrams of the suspect vehicle he had seen that morning. Barnard then walked to the front of the driver's truck and peered through the window. He observed various items of personal property inside the cab. At the troopers' request, Dorris showed them his driver's license, and was advised of his *Miranda* rights. In response to questioning about his activities that morning, Dorris said that he had been at home and was going to cut firewood. He omitted any

mention of a stop at the Palczer home. When Barnard asked Dorris why he was parked in the driveway of the residence on the Old Nenana Highway, Dorris requested to speak to an attorney. Barnard then formally told Dorris he was under arrest for burglary.

Dorris had voluntarily stopped and exited his vehicle. The act of the troopers in drawing and pointing their weapons at him as he left his vehicle, however, constituted a forcible stop requiring justification under the state and federal constitutions. *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Coleman v. State,* 553 P.2d 40, 43–47 (Alaska 1976).

Dorris contends that a forcible seizure at gunpoint constitutes an arrest requiring probable cause. He relies on *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), *United States v. Ramos-Zaragosa,* 516 F.2d 141, 144 (9th Cir.1975) and *United States v. Strickler,* 490 F.2d 378, 380 (9th Cir.1974). *See also City of Nome v. Ailak,* 570 P.2d 162 (Alaska 1977); *Richardson v. State,* 563 P.2d 266 (Alaska 1977) (any show of force creating an actual restraint or submission to authority constitutes an arrest not a stop, AS 12.25.050). The state counters that drawn guns alone do not convert an investigatory stop into an arrest and that a reasonable suspicion that the person stopped has engaged in criminal activity and is armed and dangerous should suffice. The state argues that *Henry v. United States* has been substantially undercut by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that *Ramos-Zaragosa* and *Strickler* represent a decidedly minority view. *See* 3 W. LaFave, *Search and Seizure* § 9.2(d), at 28–33 (1978). Whether or not drawn guns convert an investigative stop into an arrest, such a show of force requires a greater justification than would a less forcible detention. *See id.* It is not necessary, however, for us to decide whether the troopers' use of drawn guns turned their stopping Dorris into an arrest, or constituted an impermissible stop. We are satisfied that the officers' observation of Dorris' tires and their view of items in plain view on the seat of the cab of his truck, were not obtained through exploitation of any illegality. Dorris stopped and exited his vehicle before the troopers initiated any illegal stop. Dorris' vehicle had not been seized at the time Barnard made his observations. An examination of the tires of a vehicle is not a search. *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). Nor is an observation through a window of items in plain view inside an automobile a search. *Uptegraft v. State,* 621 P.2d 5, 8–9 (Alaska 1980). Consequently, we conclude that Barnard's observations were not the result of his exploitation of any illegal stop of Dorris. *See U.S. v. Crews,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). Once these observations had been made, the troopers had probable cause to arrest Dorris. Therefore, Dorris' subsequent evasive statements about his presence in the Palczer driveway were admissible against him.

The state concedes a number of discrepancies in affidavits submitted in support of a warrant to search Dorris' residence for the proceeds of the six burglaries being investigated.

The information contained in Trooper Burger's affidavit in support of a search warrant is divided into sixteen paragraphs. The state concedes that paragraph twelve contains two false statements attributed to Petra Wantelet:

[S]he stated that defendant had brought into their home one [sic] occasion ivory tusks and on another occasion a stereo, and that she didn't believe his story about how he came into possession of the property;

The state also concedes that the statement in paragraph seven that "defendant was observed to go inside the residence of Terry and Roxanne Palczer at approximately .9 Mile Old Nenana Highway;" was misleading since no one specifically saw Dorris enter the dwelling. The officers merely inferred his entrance from viewing his empty vehicle. Finally, Dorris contends that Burger had no first-hand knowledge about the facts in his affidavit, all of which were

furnished by victims and other officers. Since the source of the information in the affidavit is not disclosed, Dorris concludes the magistrate could not determine the credibility of the persons providing the information and therefore the warrants should be voided and the evidence seized suppressed.

■ We are not satisfied that the statements complained about were sufficiently material to warrant invalidating the warrants. Paragraphs three, four and five of the affidavit establish that Dorris' vehicle had tires matching the tracks found at three of the burgled residences and that items found in Dorris' truck were traced to items stolen from the Palczer residence. We hold that this evidence standing alone was sufficient to enable the magistrate to find probable cause. *State v. Davenport,* 510 P.2d 78, 82 (Alaska 1973). We are further satisfied that the erroneous information was not so significant that it would lead the magistrate to base his finding of probable cause primarily upon it and not fully consider the other evidence.

■ It is not necessary that every statement of fact in an affidavit be traced to its ultimate source. *Id.* at 82, n. 8. We are satisfied that the affidavit read in a common sense way established that the sources of the information contained within it were either victims or other officers and, given the corroboration inherent in the tire tracks, appearing at the three burglary scenes and on Dorris' truck, provide sufficient indicia of the reliability of the persons providing information to warrant the magistrate in believing the facts alleged and in issuing the warrants. *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). We do note, however, that the United States Supreme Court requires that an affidavit submitted in support of an application for search warrant establish the "basis of knowledge" and the "veracity" of the source or sources of the information it contains. *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). We believe that in this case the affidavit, by failing to make clear the basis of knowledge and the veracity of the sources of information contained therein, came perilously close to failing to meet this standard. We caution magistrates who are presented with affidavits in support of search warrants to assure that the informant's basis of knowledge and the veracity of the information contained in the affidavit are spelled out in as great a detail as is reasonably possible. Naturally, the magistrate could, and in many cases should, supplement the affidavit by examining the affiant under oath. Deficiencies in the affidavit may be remedied in this way.

Since we have concluded that the evidence admitted against Dorris was not illegally obtained, it necessarily follows that its consideration by the grand jury did not invalidate the indictment.

■ Dorris challenges his sentence in two respects. First he argues that AS 12.55.-100(2) only allows the court to order restitution "for actual damages or loss caused by the crime for which conviction was had." Dorris was ordered to pay $1,132.46 to a named victim or the victim's insurer. He concedes that the victim suffered the loss but argues that it was covered by insurance and therefore he must either pay the victim, who in fact lost nothing, or the victim's insurer who did not suffer a loss caused by the crime but rather one caused by the insurance contract. We reject Dorris' argument. The judgment requires payment to be made to the victim. The collateral source rule prevents Dorris from benefiting from his victim's insurance. We do not understand Dorris to be contending that the collateral source rule turns actual damage into punitive damages. The Alaska Supreme Court has always treated the two concepts differently. *Compare Beaulieu v. Elliott,* 434 P.2d 665, 673–74 (Alaska 1967) (collateral source rule) *with Alaska Placer Co. v. Lee,* 553 P.2d 54, 61 (Alaska 1976) (punitive damages). To the extent that the victim elects to pay over to her insurer whether or not compelled by contract to do so, we consider that a matter between insured and insurer and therefore irrelevant.

Since the purpose of the restitution statute is to make the victim whole we do not believe the court erred in requiring Dorris to pay interest in a reasonable amount on the amount awarded. *Compare Leuch v. State,* 633 P.2d 1006, 1013 (Alaska 1981) (emphasizing desirability of restitution as a remedy) *with State v. Phillips,* 470 P.2d 266, 272–74 (Alaska 1970) (an award of interest necessary to make victim whole); *but cf.* AS 12.55.045(b) (an order of restitution under this section does not limit any civil liability of the defendant arising from his conduct). We view this provision as a protection of the victim's rights, not a limitation on the sentencing court's power to award full restitution.

Finally, Dorris complains that the court imposed an illegal fine, since the fine was not part of the original sentence but was added after Dorris successfully moved to have the sentence amended to strike amounts paid to victims of burglaries to which Dorris did not plead. *Schwing v. State,* 633 P.2d 311 (Alaska App.1981). Dorris does not argue that the fine is unreasonable in amount. We are satisfied that the court did not err. Restitution serves two purposes: (1) it reimburses the victim for his loss, and (2) it sanctions the defendant for his crime. Assuming the restitution award was improper, the court could substitute a fine to satisfy the second goal without violating Dorris' right not to have his sentence increased so long as the fine imposed did not exceed the restitution previously required but set aside. *See Boyne v. State,* 586 P.2d 1250, 1252 n. 4 (Alaska 1978).

The judgment of the superior court is AFFIRMED.