Miriam M. MAHAN, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7662.

Court of Appeals of Alaska.

July 26, 2002.

Carol A. Brenckle, Kenai, for Appellant.

John W. Wolfe, Assistant District Attorney, Dwayne McConnell, District Attorney, Kenai, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Miriam M. Mahan kept over 130 animals on her property, including 9 horses, 2 llamas, 10 cows, 18 sheep, 1 goat, 34 pigs, 21 dogs, 10 cats, 18 assorted birds, and a number of rabbits. At the request of some of Mahan's relatives, a private organization called Alaska Equine Rescue entered Mahan's property to check on the condition of these animals. They found that the animals were in ill-health and were not adequately cared for. With the aid of the Alaska State Troopers, Equine Rescue removed the animals from Mahan's property and found foster homes for them.

Mahan was ultimately convicted of one consolidated count of cruelty to animals, AS

11.61.140(a)(1)-(2), for neglecting these animals. She now appeals her conviction and certain aspects of her sentence.

Mahan raises a number of claims on appeal. For the reasons explained here, we conclude that none of these claims has merit, and we therefore affirm Mahan's conviction and sentence.

### Mahan's request for a writ of assistance

After Alaska Equine Rescue rescued the animals from Mahan's property, it placed them with various "foster families". When Mahan's attorney prepared for trial, she arranged through Equine Rescue to visit Mahan's animals and the families caring for them. However, the defense attorney's initial visits did not go well, and the foster families (apparently through Equine Rescue) resisted further contacts. Ultimately, Equine Rescue agreed to further visits, but only if the defense attorney refrained from pressuring the foster families to answer a questionnaire that the defense attorney had prepared.

At this point, Mahan's attorney asked the district court to issue a writ of assistance—a court order directing the state troopers to accompany the defense attorney on her visits to the foster families. The defense attorney conceded that the foster families were willing to allow her to visit their property and to photograph Mahan's animals, but the defense attorney claimed that the foster families were unwilling to answer her questionnaire. Thus, the defense attorney told the court, she needed police assistance to get the foster families to answer her questionnaire.

A "writ of assistance" is a court order directing law enforcement officers to assist a litigant in enforcing a judgement or decree. *Black's Law Dictionary* defines "writ of assistance" as limited to enforcement of decrees adjudicating title to real property[1], but Alaska cases use the term in a broader sense.

For example, one Alaska case speaks of a writ of assistance to aid a trustee in supervising and preventing the removal or destruction of assets that were the subject of a prejudgement attachment.[2] Several other supreme court decisions refer to writs of assistance issued to enforce child custody and visitation decrees[3], and one case speaks of a writ of assistance issued to aid the Division of Family and Youth Services in entering a home to investigate a child's welfare.[4]

█ But although Alaska cases may use the term "writ of assistance" in a broader sense than its historical origins, the gist of a writ of assistance remains the same: it is a court order directing law enforcement officers to assist a person in enforcing a prior court order when there is reason to believe that enforcement efforts may be met with forcible opposition.

█ Thus, to determine whether Mahan's attorney was entitled to a writ of assistance to help her force the foster families to answer her questionnaire, the primary question to ask is whether Mahan's attorney was legally entitled to demand answers to her questionnaire in the first place. The answer is no. A person has no legal duty to answer an attorney's questions unless the questions are posed after the person has been sworn as a witness at a deposition or court hearing.

If Mahan's attorney believed that her client would be denied a fair trial unless the foster families were forced to answer the questions in her questionnaire, she could have asked the district court to order the deposition of these families under Alaska Criminal Rule 15(a). But unless and until the court ordered a deposition and the foster families were properly subpoenaed to attend that deposition, the families were under no legal obligation to respond to the questionnaire—and, thus, the defense attorney was not entitled to police assistance to force or intimidate the families to answer her ques-

---

1. *Id.* (7th edition, 1999), p. 1603.

2. See *Eagle Air, Inc. v. Corroon and Black / Dawson and Co. of Alaska, Inc.,* 648 P.2d 1000, 1006 (Alaska 1982).

3. See *Pauley v. Anchorage School District,* 31 P.3d 1284, 1285 (Alaska 2001); *Puhlman v. Turner,* 874 P.2d 291, 292 (Alaska 1994); *Adoption of N.P.S.,* 868 P.2d 934, 936 (Alaska 1994).

4. See *D.M. v. Div. of Family and Youth Services,* 995 P.2d 205, 207 (Alaska 2000).

tions. We therefore uphold the district court's denial of Mahan's request for a writ of assistance.

### Mahan's request for a change of venue

■ Mahan asked the district court to change the venue of her trial because of the publicity that her case had generated locally. The court chose to defer its decision on this matter until it could assess the results of jury selection.[5] After hearing the *voir dire* examinations of many prospective jurors, the district court denied Mahan's motion.

On appeal, Mahan does not give a single example of the publicity that she complains of. Even her trial court motion is unsupported by evidence. Instead, Mahan's attorney simply made the assertion that Mahan's case had been discussed in "newspaper articles in the Peninsula Clarion and Anchorage Daily News" and that "KTUU–TV ha[d] run numerous stories involving this case and Equine Rescue". Mahan's attorney did not describe the content or tenor of this media coverage except to say that Kenai District Attorney Dwayne McConnell "[was] quoted in the Peninsula Clarion article" and that "Lieutenant Bowman, [the] Detachment Commander [of the] Soldotna Post [of the Alaska State Troopers] was featured in one of the early KTUU–TV broadcasts".

■ On appeal, Mahan asserts that her jury could not have been fair because, of the 32 prospective jurors summoned to court for her case, 16 had been exposed to pre-trial publicity about the case. But exposure to pre-trial publicity does not equal bias. The question is whether the pre-trial publicity prejudiced these 16 prospective jurors against Mahan to such an extent that they would be unable to judge her case fairly. Generally, these 16 people testified that they had read or heard about the case only once or twice, near the time when the animals were removed from Mahan's custody.

■ Moreover, all but one of these 16 prospective jurors were excused, either for cause or through peremptory challenges. Even if we accepted Mahan's assertion that these 15 excused jurors were prejudiced against her as a result of their exposure to pre-trial publicity, this would not require a change of venue. As we explained in *Cheely v. State*, 861 P.2d 1168 (Alaska App.1993), "the question is not how many biased prospective jurors were identified and excused; rather, the question is whether there is substantial reason to doubt the impartiality of the jurors who remained after the selection process was complete."[6]

Of the jurors ultimately selected to try Mahan's case, only one had heard or read any pre-trial publicity about the case. This one juror stated that she had read about Mahan's case in the newspaper, but she also declared that this newspaper coverage had not made a strong impression on her and that she had not formed any opinion about Mahan's guilt or innocence. The trial judge found that this juror could be fair, and Mahan does not directly challenge this ruling on appeal.

In short, the record contains no indication that the people who served as jurors at Mahan's trial were unable to judge the case fairly. We therefore uphold the district court's denial of Mahan's motion for a change of venue.

### Mahan's suppression motion

Just before Mahan's trial began, Mahan's attorney filed a motion seeking suppression of most of the State's evidence. The defense attorney claimed that Alaska Equine Rescue and the state troopers had unlawfully entered her land when they came to inspect the animals and, later, to retrieve them.

The trial judge, Superior Court Judge Jonathan H. Link, told the defense attorney that he would not decide her motion before trial—because trial was scheduled to begin before the State was obliged to file its response. (Under Alaska Criminal Rule 42(c), the State had ten days to file its response to Mahan's

---

**5.** This is the preferred course of action. See *Wylie v. State*, 797 P.2d 651, 656 (Alaska App. 1990), where we endorsed the rule that, generally speaking, motions for change of venue based

on pre-trial publicity should *not* be decided until jury selection has been attempted.

**6.** *Id.* at 1175.

motion.) Upon hearing that Judge Link would wait ten days for the State to respond to her motion, the defense attorney asked the judge if he would base his decision on the evidence presented at trial. Judge Link responded that he would do so "if it [was] appropriate".

Mahan's trial ended on March 2, 2000. The State filed its response to Mahan's suppression motion on the following day, March 3rd. But Judge Link never ruled on Mahan's motion, and Mahan never asked the judge to do so. The parties appeared in court for sentencing on March 13th, but Mahan did not press Judge Link to decide the pending suppression motion, nor did she renew her motion based on the evidence presented at trial.

■ To preserve an issue for appeal, an appellant must obtain an adverse ruling. We have consistently held that a defendant who chooses to proceed without demanding a ruling from the trial court waives the potential claim of error.[7] Here, Mahan's failure to ask Judge Link for a ruling on her suppression motion constitutes a waiver of this claim.

### Mahan's term of probation

Mahan received a sentence of 1 year's imprisonment, all suspended. She does not challenge her suspended term of imprisonment, but rather three other facets of her sentence.

First, Mahan asserts that Judge Link was clearly mistaken when he placed her on probation for 10 years. Mahan argues that, because she was a first offender convicted of a misdemeanor, a 5–year term of probation would have been sufficient to ensure her rehabilitation and protect the public.

■ But Judge Link found that Mahan's conduct was "among the worst offenses". He declared that it was "beyond argument

that these animals were severely abused over a long period of time". Based on these findings, and given Mahan's failure to explain why she could be trusted not to neglect animals in the future, we conclude that Judge Link was not clearly mistaken when he imposed the 10–year period of probation.

### Mahan's conditions of probation

Mahan challenges two of her conditions of probation. Judge Link ordered her not to own (or be the primary caretaker of) more than one animal during her term of probation, and he prohibited her from owning or caring for a horse. Mahan's "argument" of this point consists of a two-sentence description of these two conditions. She does not state why she believes that Judge Link abused his sentencing discretion when he imposed them.

■ Given Mahan's conduct in this case, these two conditions of probation are not facially unreasonable. Mahan's failure to offer any argument to the contrary constitutes a waiver of her claims.[8]

### The amount of Mahan's restitution

Mahan claims that the record does not support the amount of restitution ordered by Judge Link. Initially, on April 26, 2000, Judge Link ordered Mahan to pay slightly more than $30,000 restitution to Alaska Equine Rescue for the cost of maintaining Mahan's animals pending the outcome of the prosecution against her. Mahan was given until May 28, 2000 to pay this restitution, but the deadline was later postponed to July 16, 2000. Because Mahan's conditions of probation barred her from continuing to own the animals, and because Equine Rescue would continue to pay to maintain the animals until they were sold, Judge Link ordered that Mahan's restitution debt would increase by $150 per day until she sold the animals. By

---

7. See Marino v. State, 934 P.2d 1321, 1327 (Alaska App.1997) (defendant proceeded to trial without demanding a ruling on his discovery request); Erickson v. State, 824 P.2d 725, 733 (Alaska App.1991) (defendant failed to press the trial judge for a ruling on his motion to suppress his statements to the police); Jonas v. State, 773 P.2d 960, 963 (Alaska App.1989) (defendant proceeded to trial without demanding a ruling on

his motion for a psychiatric evaluation of the complaining witness).

8. See Petersen v. Mutual Life Insurance Co. of New York, 803 P.2d 406, 410 (Alaska 1990) (when a claim is given only cursory treatment in a party's brief, the appellate court can deem the point waived and not consider it).

the end of May 2000 (when Judge Link issued his final judgement in this case), the amount of restitution had increased to slightly more than $36,000.

Mahan's challenge to this figure of $36,000 is fairly cursory. She asserts that the figure is suspect because the district court would not issue the requested writ of assistance to force the foster families to answer her questionnaire. But Mahan had the opportunity to challenge Equine Rescue's restitution claims at the restitution hearing.

■ On appeal, she identifies only one restitution claim as questionable: the request for $1600 to repay one of the foster families for constructing additional fencing so that all of Mahan's roughly three dozen pigs could be kept at one location. But Judge Link could reasonably determine that, in the end, it would be more cost-effective to house and feed all the pigs in one location. Thus, despite the cost of the additional fencing, Judge Link could reasonably conclude that the expense of maintaining these animals—and, thus, the amount of Mahan's restitution obligation—would ultimately be reduced if all the pigs were housed together. Mahan offers no argument to the contrary.

### The purported "forfeiture" of Mahan's animals

Mahan argues that Judge Link exceeded his sentencing authority when he ordered Mahan's animals "forfeited" to Alaska Equine Rescue. But Judge Link ordered no forfeiture.

During the sentencing proceedings, the State indeed urged Judge Link to order forfeiture of Mahan's animals to Equine Rescue, but the judge concluded that he had no authority to do so. Instead, the judge issued an order that, in effect, made Mahan's animals the security for the restitution debt Mahan owed to Equine Rescue.

As explained above, Judge Link ultimately ordered Mahan to pay slightly more than $36,000 restitution to Equine Rescue for the cost of maintaining Mahan's animals pending the outcome of the prosecution against her. Mahan's deadline for paying this restitution was July 16, 2000.

Because a separate condition of probation forbade Mahan from continuing to own animals, Judge Link directed Mahan to sell her animals. Under Judge Link's order, Alaska Equine Rescue would receive the proceeds of these sales until Mahan's restitution obligation was satisfied. (As noted earlier, to offset the continuing cost of maintaining the animals until they were sold, Mahan's amount of restitution would increase by $150 per day "until [Mahan] divest[ed] herself of all ownership interest in the animals".)

To prevent Mahan from selling the animals at below-market prices, Judge Link further ordered that, regardless of the sales price, "Alaska Equine Rescue must be paid the fair market value of the animal prior to the transfer of any ownership interest".

The next paragraph of Judge Link's order stated that, in the event that Mahan (1) failed to sell the animals and (2) failed to otherwise pay the restitution owed to Alaska Equine Rescue by the deadline, "all of [Mahan's] ownership interest in the remaining animals [would] transfer to Alaska Equine Rescue by operation of law"—but, in this event, Mahan's restitution obligation would be reduced by the market value of the animals. Based on the evidence presented at the restitution hearing, Judge Link initially calculated the total market value of the animals at $13,775. This figure was later revised to $20,000, exclusive of the pigs, which were to be valued separately.

■ Mahan argues that Judge Link's order amounted to a forfeiture of her animals to Alaska Equine Rescue—a "forfeiture [that] is not permitted under Alaska law". But a forfeiture is a penalty—a loss of property without compensation. Judge Link did not order forfeiture of the animals. Rather, he ordered Mahan to sell the animals to satisfy her restitution obligation to Alaska Equine Rescue. Two conditions governed these sales: Mahan could not sell the animals for less than fair market value, and the sales had to take place by July 16, 2000.

Judge Link further ordered that if Mahan's restitution obligation was not paid on time, the animals would become the property of Alaska Equine Rescue (the entity to whom

Mahan owed the debt), and Mahan's debt would be reduced accordingly. Until then, Mahan remained free to sell the animals to anyone, but she had to do so within the time allotted, and not for less than fair market value.

In other words, Judge Link effectively placed a lien on the animals, making them security for Mahan's restitution debt if that debt was not satisfied by July 16, 2000. The judge declared that if Mahan failed to sell the animals as prescribed, the animals would become the property of Equine Rescue, but Equine Rescue would have to pay Mahan fair market value for them—*i.e.*, Mahan's restitution debt would be reduced by the fair market value of the animals.

We have already upheld the condition of probation that forbids Mahan from owning more than one animal (and no horses), so it follows that Judge Link could order Mahan to divest herself of the animals. Because Mahan owed a substantial amount of restitution to Alaska Equine Rescue, Judge Link could reasonably require Mahan to pay that restitution from the proceeds of the animal sales if she did not otherwise satisfy her restitution obligation. Likewise, Judge Link could reasonably prohibit Mahan from selling the animals for less than fair market value.

Because Alaska Equine Rescue was spending a considerable amount of money to maintain the animals for each day that their final ownership remained unsettled, it was reasonable for Judge Link to place a time limit on Mahan's efforts to sell the animals. And finally, it was reasonable for Judge Link to give Equine Rescue a lien on the animals so that, if Mahan would not or could not sell them for fair market value within the time allotted, Equine Rescue would gain ownership of the animals and Mahan would have her restitution debt reduced by their fair market value.

One might, perhaps, debate whether Alaska's restitution statutes actually authorize a sentencing judge to place this sort of lien on the defendant's property. But Mahan does not address this issue. She argues only that Judge Link's order constituted a "forfeiture"—a contention that we reject.

Mahan also complains that Judge Link refused to recognize her purported sale of the animals to "RPM, Inc." on April 28, 2000 for the price of $13,375. But Judge Link considered this issue and ultimately ruled that no sale had occurred. Mahan does not address this ruling or argue why it is erroneous. Moreover, as already explained, Judge Link eventually concluded that the animals (leaving aside the pigs) had a fair market value of $20,000. Under the terms of the sentencing order, any sale of the animals for less than this amount would be void.

*Whether Mahan's restitution should be reduced by the amount of donations that Alaska Equine Rescue received from members of the community*

Finally, Mahan claims that her restitution obligation should be reduced by the approximately $20,000 in donations that Alaska Equine Rescue received from members of the community to help defray the cost of maintaining Mahan's animals.

Mahan's argument is facially appealing. The purpose of restitution is to make someone whole, not to enrich them.[9] Because members of the community responded to the call for help and donated money to Alaska Equine Rescue, there is a distinct possibility that the total money received by that organization—the donations, plus the amount that Mahan pays in restitution—will more than offset the costs incurred by the organization and the foster families that Equine Rescue enlisted to care for Mahan's animals.

On the other hand, it is unlikely that the people who donated money to Alaska Equine Rescue intended for their donations to reduce Mahan's restitution obligation. It is more probable that these people intended their donations to accomplish two goals: first, to make sure that Equine Rescue could meet the current expenses of maintaining Mahan's animals until Mahan ultimately paid any restitution ordered by the court; and second, to make sure that Equine Rescue

---

9. *See Demers v. State,* 42 P.3d 1, 3 (Alaska App. 2002) (Mannheimer, J., concurring) ("The aim of restitution is to restore victims to their financial condition before the crime.").

would be able to bear the full cost of maintaining Mahan's animals even if Mahan herself never fully reimbursed the organization for its expenses.

This is not the first time that we have had to decide how contributions to crime victims from members of the community affect a defendant's duty to pay restitution. In *Demers v. State*, 42 P.3d 1 (Alaska App.2002), we addressed a different aspect of this restitution problem: whether a defendant could be ordered to pay restitution for the value of non-monetary donations (donations of goods and services) made by members of the community to offset or ameliorate the victim's loss. To the extent that such non-monetary donations reduce the expenses that the victim would otherwise have to bear, these contributions from members of the community might reasonably be considered part of the total social cost of the defendant's crime. Nevertheless, we concluded that Alaska's restitution statutes do not authorize a sentencing court to order a defendant to reimburse the value of these non-monetary contributions.[10]

Mahan's case presents a different issue. The amount of costs occasioned by Mahan's crime is not at issue—or, more precisely, we have already upheld Judge Link's valuation of these costs. Rather, the question is whether Mahan's duty to repay these costs should be reduced by the amount of monetary donations that the victim has received from members of the community.

■ As we remarked above, the probable intent of the contributors was to make sure that Alaska Equine Rescue would be able to bear the cost of maintaining Mahan's animals even if Mahan never made full restitution for the organization's expenses. In this respect, the private contributors played much the same role as an insurance or indemnity company. Because of this, we conclude that our decision in *Dorris v. State*, 656 P.2d 578 (Alaska App.1982), provides the rule that governs Mahan's case.

In *Dorris*, we upheld a restitution award even though the victim was insured for the loss caused by the defendant. We held that the sentencing court could properly order the defendant to pay the restitution even though the victim might be obligated (either legally or morally) to turn over any extra money to the insurance company.[11]

■ Obviously, the private contributors in this case are not the legal equivalent of an insurance company—for they were not contractually obligated to reimburse Alaska Equine Rescue for its expenses. But we believe that the underlying principle is the same: when the victim of a crime receives money from a third party—either contractual payments from an insurance company or voluntary donations from members of the public—this money should not reduce the amount of restitution that the offender can be ordered to pay.

We note that Alaska Equine Rescue is an ongoing non-profit organization, part of a nation-wide network of similar organizations whose goal is to identify and care for abused animals (and secure the return of stolen animals).[12] Although the impetus for the private donations at issue here may have been the particular expenses caused by Mahan's crime, we assume that, in the event these donations exceeded expenses, the people who gave the money would want it to be used for the continuing efforts of Alaska Equine Rescue, or refunded, rather than having it turned over to Mahan.

■ Additionally, as we noted in *Dorris*, restitution serves two goals: not only restoring victims, but also making defendants pay the expenses they have caused by their criminal conduct.[13] This second goal would not be served if defendants received credit for money that crime victims received from sympathetic members of the community. Under such a rule, defendants would, in effect, be enriched by these donations: either the donations would reduce the amount of the defendant's unpaid restitution obligation or, if

10. *See id.* at 2.

11. *See id.* at 583–84.

12. *See, e.g.,* http://www.equinerescue.com/staterescues.html.

13. *See Dorris,* 656 P.2d at 584.

the defendant had already satisfied their restitution obligation, the donated money would have to be turned over to the defendant to reimburse the "extra" restitution they had paid. This result would discourage the community from coming to the aid of a crime victim.

For these reasons, we conclude that a defendant who is ordered to pay restitution is not entitled to a credit, an offset, or a refund for monetary donations received by the crime victim. The district court therefore properly denied Mahan's request to have her restitution reduced by the approximately $20,000 in donations that Alaska Equine Rescue received from the community.

*Conclusion*

The judgement of the district court is AFFIRMED.