Michael F. LONIS, Appellant,

v.

STATE of Alaska, Appellee.

Nos. A–6974, A–7409.

Court of Appeals of Alaska.

Feb. 18, 2000.

---

Michael P. Heiser, Ketchikan, for Appellant.

W.H. Hawley, Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, MANNHEIMER and STEWART, Judges.

*OPINION*

COATS, Chief Judge.

Michael F. Lonis was convicted, following a jury trial, of three counts of assault in the third-degree, class C felonies; driving while intoxicated, a class A misdemeanor; and failure to give notice of an accident, a class A misdemeanor. Superior Court Judge Larry C. Zervos sentenced Lonis to a composite sentence of five years and nine months with two years suspended. Lonis appeals to this court, arguing that Judge Zervos had no authority to forfeit bail based upon Lonis' failure to abide by his conditions of release, that Judge Zervos erred in granting a change of venue motion, changing venue to Ketchikan, and in not letting Lonis personally address the jury during argument. He also argues that Judge Zervos erred in awarding restitution to the victim's insurance company and imposed an excessive sentence. We conclude that Judge Zervos erred in forfeiting Lonis' bond based upon Lonis' failure to abide by his conditions of release. In all other respects, we conclude that Lonis' contentions are not meritorious, and affirm his convictions and sentence.

On July 18, 1997, at approximately 5:00 p.m., Michael F. Lonis was driving his pickup truck in Wrangell, Alaska. Lonis' young son, Elwood, was in the truck with him. While driving down Case Avenue, Lonis lost control of his truck and crashed into the home of Wes and Helen Allen. The truck hit the house near the kitchen. Mrs. Allen was alone in the home at the time and sustained injuries to her neck and stomach.

After the crash, Lonis got out of his truck, and crawled into the wreckage of the house in order to lock his front hubs so that he could engage his four wheel drive. Lonis then backed out of the Allen's house and drove away. In the process, he nearly hit another car, then ran into a ditch and across a driveway. His driving was very erratic. Due to damage to his truck, Lonis had difficulty driving to his apartment. Upon arriving at his apartment, he grabbed Elwood and dragged him into the apartment complex.

Sergeant Woods was the first police officer to arrive at Lonis' apartment. Woods knocked on the door and announced herself

as a police officer. Lonis did not respond. Officer Chafin later went to Lonis' apartment. Lonis told Officer Chafin that the police would not take him in without a fight. Lonis threatened to kill Chafin and appeared to arm himself with a rifle. Later, while Lieutenant McCloskey was on the scene, Lonis came out of his apartment with a rifle. He pointed the rifle in the general direction of the police officers and again threatened to kill them. Lonis then went back into his apartment. The police evacuated residents from nearby buildings and guarded Lonis' residence. Lonis gave himself up at 5:30 a.m. the next morning.

A grand jury indicted Lonis for two counts of assault in the third-degree for threatening Officer Chafin and Lieutenant McCloskey with a rifle, two counts of assault in the third-degree for injuring Mrs. Allen and Elwood with the truck, one count of driving while intoxicated, and one count of failing to give immediate notice of an accident to the police. Lonis was acquitted on the charge that he assaulted his son, but was convicted on the remaining offenses.

Lonis first contends that Judge Zervos erred in forfeiting $4,500 of his bond based upon Lonis' failure to abide by his conditions of release. He argues that Judge Zervos had no authority to forfeit the bond unless Lonis failed to appear.

At Lonis' bail hearing on July 24, 1997, Judge Zervos attached several conditions to Lonis' release: that Lonis could not have contact with alcohol or firearms, that he must check-in daily, that the police would search Lonis' house before his release, and that he must post a $5,000 bond. Judge Zervos explained that the purpose of the bond was to guarantee Lonis' appearance and to guarantee Lonis' compliance with his conditions of release. The court's Temporary Order dated July 25, 1997 stated that Lonis had posted an appearance and performance cash bond of $5,000. In addition, the order and conditions of release stated that Lonis was required to obey all municipal, state, and federal laws and ordinances.

On December 24, 1997, Lonis was arrested in Pennsylvania for simple assault, endanger-

ing the welfare of a minor, disorderly conduct, and public drunkenness. Subsequently, he pled guilty to two counts of disorderly conduct and harassment, and was sentenced to time served.

On February 26, 1998, Judge Zervos held a hearing on the state's motion to forfeit Lonis' bond. At this hearing, the judge explained that Lonis had notice that his money would be subject to forfeiture if he violated the conditions of bail. He found that Lonis' misdemeanor convictions in Pennsylvania constituted a violation of his conditions of release. Noting that the state expended significant funds in bringing Lonis back to Alaska,[1] the judge ordered forfeiture of $4,500 of Lonis' $5,000 bond.

Bail release before trial and after conviction is governed by AS 12.30.020.[2] Under this statute, a court may require the defendant to post monetary bail, either in the form of an appearance bond secured by a deposit of money or in the form of a commercially issued bail bond.[3] This money or bond (a conditional promise to pay money) figuratively takes the place of the defendant. Under Criminal Rule 41(e), a court must release the deposited money and/or exonerate the bond if the defendant is returned to custody before the bail is forfeited. And Criminal Rule 41(f) declares that, even after bail is forfeited, the owner of the deposited money or the sureties on the bond may apply to the court for remission of the forfeiture if they helped to secure the return of the defendant to custody or if they prove other extenuating circumstances.

In addition to authorizing the imposition of monetary bail, AS 12.30.020 also authorizes a court to impose other conditions of release. The court may require a defendant to remain in the custody of a designated person or organization,[4] to remain in particular locales or residences,[5] or to spend nights in custody.[6]

Indeed, AS 12.30.020(b)(6) authorizes a court to "impose any other condition [of release] considered reasonably necessary to assure the defendant's appearance as required and the safety of the alleged victim, other persons, or the community."

With respect to monetary bail, AS 12.30.060 declares that a defendant who willfully fails to appear in court as required "shall incur a forfeiture of any security ... given or pledged for the person's release[.]" Criminal Rule 41(f)(1) echoes the statute and specifies the procedures for declaring and enforcing the forfeiture. Thus, both the statute and the rule authorize the court to seize the pledged bail money when the defendant willfully fails to appear. But neither the statute nor the rule authorizes the court to seize a defendant's bail when the defendant fails to comply with the other conditions of release.

The state argues that the bail statute implicitly grants this authority to the courts. According to the state, when the legislature gave courts the power to impose non-monetary conditions of release, the legislature must have intended for courts to employ bail forfeiture as a means of enforcing these non-monetary conditions. But there is no legislative history to support the state's assertion. Indeed, even though the legislature amended AS 12.30.020 over thirty years ago to allow a court to impose non-monetary conditions of release,[7] the legislature has never amended AS 12.30.060 to authorize bail forfeiture as a penalty for violating these non-monetary conditions.

The state would have us interpret the legislature's inaction as an oversight, but we are not convinced. We note that the drafters of the federal bail statute, 18 U.S.C. § 3142, specifically intended that monetary bail be imposed only to assure a defendant's appearance.[8] We also note that, were we to adopt

1. $4,117.07.

2. AS 12.30.040 (applying AS 12.30.020 to persons who have been convicted and await sentencing).

3. AS 12.30.020(b)(4)-(5).

4. AS 12.30.020(b)(1).

5. AS 12.30.020(b)(2).

6. AS 12.30.020(b)(3).

7. See Ch. 12 §§ 1–2, SLA 1967.

8. See S.Rep. No. 98–225 at pp. 15–16 (1985) (concerning the Comprehensive Crime Control Act of 1984): "[T]he Committee was urged in the

the state's position, this would have a major impact on the issuance of bail bonds.

Commercial sureties, as well as family and friends, would suddenly face significant additional risks to the money and property they pledged to secure a defendant's release. The money and property would be subject to forfeiture under many additional circumstances, and it is unclear what the person would have to do to seek a remission of the forfeiture. Criminal Rule 41(f)(4) states that a person who furnished or pledged the money or property can seek remission of a bail forfeiture by helping to cure the defendant's failure to appear—that is, by assisting the authorities in securing the defendant's return to custody. But there is no apparent way for a surety to "cure" the violation of a bail order forbidding the defendant from drinking alcohol, visiting a particular locale, or leaving home after dark.

A court's authority to grant pre-trial release, to formulate conditions of release, and to punish a defendant for failing to abide by these conditions, are all governed by statute. The legislature has given courts broad power to set conditions of release, and it has equipped courts with various methods of enforcing those conditions of release. When a defendant violates the conditions of release, the court may issue a warrant for the defendant's arrest, the court may revise the conditions of release to make them more onerous, and the court can initiate contempt proceedings against the defendant.[9] But, with respect to bail forfeiture, AS 12.30.060 and Criminal Rule 41 speak of imposing this penalty for only one type of violation—a defendant's failure to appear. For the reasons discussed above, we reject the state's contention that the statute and the rule should be interpreted as implicitly granting courts the authority to forfeit bail in other circumstances.

■ We likewise reject the state's argument that, if the statute and the rule are silent on the issue of non-monetary conditions of release, courts still possess a common law power to seize a defendant's bail when the defendant violates one or more of these non-monetary conditions. True, courts have the authority under the common law to establish rules for bail release in situations that are not covered by constitutional or statutory law.[10] But we believe the present situation *is* covered by legislation. As discussed above, if courts were allowed to seize a defendant's bail for violation of non-monetary conditions of release, this would work a major change in the law of bail, and it would likely affect the readiness of sureties (both commercial and informal) to pledge their money and property to secure a defendant's release. Given this fact, it seems probable that the legislature and the supreme court consciously chose to restrict bail forfeiture to circumstances in which a defendant fails to appear. Because we must not declare a rule of common law that defeats the policies embodied in statutes and court rules,[11] we decline the state's invitation to expand bail forfeiture under the rubric of the common law.

Accordingly, we hold that Judge Zervos erred when he ordered forfeiture of Lonis' bail money for reasons other than non-appearance. The money must be returned.

■ Lonis argues that Judge Zervos erred in granting Lonis' attorney's motion to move the trial court out of Wrangell once it became clear that Lonis opposed changing venue. Wrangell is a small town with fewer than 3,000 residents. During three days of jury *voir dire*, it became apparent that it would be difficult to impanel an impartial jury. The incident in question was a matter of local interest and was the subject of three stories

last Congress to abolish financial conditions of release in order to insure that imposition of excessively high bonds was not used to achieve the detention of dangerous defendants. Although the Committee and the Senate decided to retain financial conditions of release, the concern about a potential for such abuse does exist. Consequently, the use of the [monetary] conditions of release ... is specifically limited to the

purpose of assuring the appearance of the defendant.")

9. AS 12.30.070.

10. *See Hosier v. State,* 957 P.2d 1360, 1363 (Alaska App.1998).

11. *See id.*

in the local paper, THE WRANGELL SENTINEL. Many of the prospective jurors had heard of the incident and many had driven by the house that Lonis crashed into. Judge Zervos granted 41 challenges for cause during three days of jury selection. After three days of jury selection, Lonis' counsel moved for a change of venue. Counsel pointed out that almost all of the people that the parties had questioned knew the Allens or Lonis. From the jury *voir dire*, counsel concluded that "public opinion is very much against [Lonis]." The state did not oppose the motion for a change of venue, concluding that there was "a strong basis" for the attorney's conclusion that Lonis could not obtain a trial with an impartial jury in Wrangell. Lonis consistently opposed changing venue from Wrangell. Lonis insisted that he wanted to be vindicated in front of a Wrangell jury. He stated that, if necessary, he would discharge his attorney in order to have a trial in Wrangell.

Judge Zervos concluded that he should address the change of venue issue first and deal with the question of Lonis' representation at a later time. He concluded that it would not be possible for Lonis to obtain an impartial jury in Wrangell and granted the motion to change venue.

Under AS 22.10.040(1), a trial judge can change venue "when there is reason to believe that an impartial jury cannot be had[.]" The record of the jury *voir dire* supports Judge Zervos' conclusion that Lonis could not obtain an impartial jury in Wrangell. We accordingly conclude that Judge Zervos did not abuse his discretion in granting a change of venue.

■ Lonis next argues that Judge Zervos erred in moving the trial to Ketchikan rather than to Sitka. After Judge Zervos granted the motion for change of venue, he asked the prosecutor, the defense lawyer, and the defendant where they would prefer to have the trial. The state requested that the trial be held in Ketchikan. The defense suggested Sitka. The judge initially decided to conduct the trial in Sitka. However, after several of the witnesses informed the judge that they

would have great difficulty traveling to Sitka, he changed his mind and ordered the trial held in Ketchikan. The judge explained that he switched the location to Ketchikan as "a matter of convenience" for the people involved.

Judge Zervos had already determined to change venue from Wrangell because Lonis could not obtain an impartial jury at that location. He therefore had discretion to move venue to any reasonable location, subject to review only for an abuse of discretion.[12] The record shows that Ketchikan was the more convenient location for witnesses. Lonis has not advanced any reason why Judge Zervos abused his discretion other than Lonis' assertion that he felt more comfortable with the residents of Sitka serving on his jury. We conclude that Judge Zervos did not abuse his discretion in moving the venue to Ketchikan.

■ Lonis argues that Judge Zervos erred in denying his request to represent himself or, in the alternative, his request for co-counsel status. The record, however, does not show that Judge Zervos abused his discretion. Even during the discussion about whether venue would remain in Wrangell, Lonis stated that his attorney was "doing an excellent job," that he respected her opinions, and that he wished for her to remain as his attorney. Lonis stated that, if necessary, he would discharge his counsel and represent himself in order to have venue in Wrangell. But when Judge Zervos indicated that he intended to move the trial from Wrangell, Lonis did not press the issue of representation.

Over a month later, in Ketchikan, the court addressed the issue of whether Lonis wanted to represent himself. Lonis stated unequivocally that he wanted the attorney to represent him. But he indicated that he would like to address the jury at some point in the trial. The state opposed this request. Judge Zervos took the request to have Lonis address the jury under advisement.

The record reflects that Lonis ultimately chose to have counsel represent him rather than representing himself. We accordingly

**12.** *See Sever v. Alaska Pulp Corp.*, 931 P.2d 354, 361 (Alaska 1996).

conclude that he has not preserved this issue for appeal.[13] Thus, the only question before us is whether Judge Zervos erred in refusing to let Lonis address the jury at the end of the case.

■ "The trial court has broad discretion to deny hybrid representation or co-counsel status."[14] Where a defendant asks for co-counsel or hybrid representation, "a court must consider the alternatives available to it and choose among them."[15] The record shows that Judge Zervos exercised his discretion and fully considered Lonis' request. But he concluded, that in a case where Lonis had not testified, it would be unfair to have Lonis address the jury, giving him some of the benefits of testifying without being subject to cross-examination.

■ Lonis argues that this was error. He argues that he was unaware until Judge Zervos' ruling that he would not be able to address the jury unless he testified. He argues that it was too late for him to testify at that point. But at the time Judge Zervos made his ruling, the case had not yet been submitted to the jury. It appears that Lonis could have asked Judge Zervos to allow him to testify. But he did not. Furthermore, Judge Zervos was entitled to rule on the question of whether Lonis would be able to address the jury at the close of the trial. Lonis did not press for an earlier ruling and Judge Zervos was not required to give one.

Judge Zervos' reasons for denying Lonis an opportunity to personally address the jury appear sound, and we conclude that he did not abuse his discretion.

■ Lonis argues that Judge Zervos erred in ordering him to pay restitution of $30,024.11 to Allstate Insurance Company, the victim's insurer. Lonis argues that Judge Zervos had no authority to order restitution to the victim's insurer.

AS 12.55.045(a) provides that a "court may order a defendant convicted of an offense to make restitution ... to the victim or other person injured by the offense." Lonis argues that an insurance company cannot be a "victim or other person injured by the offense." But the Alaska statutes generally recognize that the term "person" includes a corporation "unless the context otherwise requires[.]"[16] Although only applying to Title 11, AS 11.81.900 defines a person to include a corporation.[17] In addition, the legislature specifically stated that it intended to have courts construe AS 12.55.045(a) broadly to require courts to order restitution to all persons who were injured as a result of a defendant's conduct.[18]

■ In interpreting a statute, this court must "adopt the rule of law which is most persuasive in light of precedent, policy, and reason."[19] It seems most likely from both the plain language of AS 12.55.045 and the stated legislative policy that an insurance

13. Criminal Rule 47(b).

14. *Ortberg v. State*, 751 P.2d 1368, 1375 (Alaska App.1988).

15. *Cano v. Municipality of Anchorage*, 627 P.2d 660, 663 (Alaska App.1981).

16. AS 01.10.060. Definitions. (a) In the laws of the state, unless the context otherwise requires,

(8) "person" includes a corporation, company, partnership, firm, association, organization, business trust, or society, as well as a natural person[.]

17. AS 11.81.900. Definitions. (a) For the purposes of this title, unless the context requires otherwise,

(42) "person" means a natural person and, when appropriate, an organization, government, or governmental instrumentality;

(40) "organization" means a legal entity, including a corporation, company, association, firm partnership, joint stock company, foundation, institution, government, society, union, club, church, or any other group of persons organized for any purpose.

18. In the Alaska Session Laws, Ch. 71, SLA 1992, the purpose of AS 12.55.045(a) was stated as follows:

Section 1. PURPOSE. It is the purpose of this Act to ensure full payment of fines imposed in criminal cases and to make full restitution available to all persons who have been injured as a result of criminal behavior, *to the greatest extent possible*, by

(3) allowing courts to order that restitution be made to all persons who have suffered a loss as a result of a defendant's conduct[.] (emphasis added).

19. *Zsupnik v. State*, 789 P.2d 357, 359 (Alaska 1990).

company which suffers a loss, because of a defendant's conduct, is a "victim" entitled to receive restitution under the statute.

Furthermore, Lonis does not claim or deny that he caused the damage which resulted in the restitution award. The court could have awarded restitution directly to the Allens, even though the Allens had already received payment from the insurance company.[20] Thus, even if we assume that the insurance company does not qualify as a "victim," Lonis has no standing to complain that the court ordered the restitution paid directly to the insurance company instead of through the Allens.

■ Lonis argues that his sentence of five years and nine months with two years suspended is excessive. Lonis points out that he was a first-felony offender for purposes of presumptive sentencing. The most serious offense for which he was convicted, assault in the third degree, is a class C felony.[21] A class C felony is punishable by a maximum term of five years of imprisonment. There is a presumptive term of two years for a second-felony offender and three years for a third-felony offender.[22] Lonis points out that when a first-felony offender is convicted of several crimes, the court is not to exceed the presumptive term for a second-felony offender for the most serious crime unless the court can give a good reason for exceeding that benchmark.[23] Lonis argues that his composite sentence should not have exceeded two years of actual imprisonment.

But we conclude that Judge Zervos gave substantial reasons for imposing the sentence for which he did. At the time of sentencing, Lonis was 36 years old. Judge Zervos pointed out that, although it did not count for purposes of presumptive sentencing, Lonis had a prior felony conviction for possession of hashish with the intent to deliver. Lonis also had several prior misdemeanor convictions. In one of these prior incidents, Lonis, carrying a 15–inch steel socket wrench, ap-

proached a man and threatened to kill him. When Lonis was placed under arrest for assault, Lonis resisted arrest and it took three police officers to subdue him. An Alaskan state trooper was injured during the arrest when Lonis repeatedly struck him. The presentence report emphasized that Lonis had a history of assaults on active duty police officers.

Lonis argued at the trial court and continues to argue on appeal that he has never seriously injured anyone with his assaultive behavior. But Judge Zervos directly addressed this contention. He concluded that, although Lonis had never seriously injured anyone physically, if Lonis continued his behavior, it was "just a question of time." He pointed out that Mrs. Allen could easily have been injured severely if she had merely been in a different location in her house. He pointed out that the police had used common sense and restraint in not confronting Lonis when he threatened them with a weapon. The police merely evacuated people from the area and waited Lonis out, rather than taking any chance of escalating the incident. He pointed out that Lonis' behavior of totally losing control of himself and engaging in dangerous and assaultive behavior was a consistent pattern which he had exhibited in the past. He concluded that Lonis was "a dangerous person" for whom rehabilitation was very guarded. Judge Zervos' findings are supported by the record and support the sentence which he imposed.

The order forfeiting Lonis' bail is REVERSED and VACATED. Lonis' convictions and sentence are AFFIRMED.

---

**20.** *See Dorris v. State,* 656 P.2d 578, 583–84 (Alaska App.1982).

**21.** AS 11.41.220(d).

**22.** AS 12.55.125(e)(1) & (2).

**23.** *See Splain v. State,* 924 P.2d 435, 437 (Alaska App.1996); *Farmer v. State,* 746 P.2d 1300, 1301 (Alaska App.1987).