Mark E. COPELAND, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7400.

Court of Appeals of Alaska.

May 30, 2003.

Bill D. Murphree, Fairbanks, for Appellant.

Rosamund M. Lockwood, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

In the summer of 1996, Mark E. Copeland began a sexual relationship with a thirteen-year-old girl, J.S. Copeland was thirty-nine years old at the time. Sometime that fall, J.S.'s parents began to suspect that something was amiss. When they searched J.S.'s room and read her diary, their fears were confirmed. They then forbade J.S. to see Copeland.

J.S. secretly continued her relationship with Copeland, skipping classes and leaving school to engage in trysts with him. In December 1996, frustrated by the restrictions that her parents were placing on her, J.S. ran away from home. Copeland arranged for J.S. to stay at a series of residences, all owned by acquaintances of his. Then, in March, Copeland (using an assumed name) rented an apartment for J.S. J.S. lived in this apartment for six months (and continued her sexual relationship with Copeland when he visited her). Finally, in September 1997, the apartment manager contacted the police.

Copeland was indicted for kidnapping and eleven counts of second-degree sexual abuse of a minor (*i.e.*, engaging in sexual penetration with a child between the age of thirteen and sixteen).[1] Copeland's first trial ended in a hung jury on all counts except one count of sexual abuse of a minor. (Copeland was acquitted of this count.) At his second trial, Copeland was acquitted of kidnapping but convicted of the lesser offense of contributing to the delinquency of a minor.[2] Of the ten remaining counts of second-degree sexual abuse of a minor, Copeland was convicted of nine and acquitted of one. For these crimes, Copeland received a composite sentence of 11 years' imprisonment with 3 years suspended—8 years to serve.

In this appeal, Copeland challenges five different evidentiary rulings made at his trial. He also contends that his sentence is excessive. For the reasons explained here, we affirm Copeland's convictions and his sentence.

*The partial disclosure of J.S.'s diary to the defense*

 When J.S.'s parents read her diary and discovered that it contained evidence that their daughter was engaging in sexual relations with Copeland, they turned the diary over to the police. The police perused the diary, identified what they believed to be the relevant portions, and turned those portions over to the district attorney's office. Following Copeland's indictment, the district attorney's office provided Copeland's defense attorney with a copy of what they had.

Suspecting that other portions of the diary might contain exculpatory or explanatory material, Copeland's attorney asked the superior court to compel production of the entire diary. Before Copeland's first trial, Superior Court Judge Niesje J. Steinkruger examined a photocopy of the complete diary. Based on her *in camera* examination, Judge Steinkruger ordered additional pages of the diary to be produced to the defense, but she declined to order production of the diary in its entirety.

During Copeland's second trial, his attorney renewed his request for production of the complete diary. This issue arose because J.S. testified that she had altered certain portions of the diary at Copeland's instruction. Copeland's attorney asserted that, if a document expert examined the diary, the examination would prove that J.S. was lying about altering the diary. Superior Court Judge *pro tem* Sigurd E. Murphy ruled that a document examiner would be allowed to examine the diary for physical alteration (or lack of physical alteration), but the expert would be ordered not to disclose the contents of any pages that the court had not released. (The record contains no indication that Copeland's attorney ever pursued this opportunity to have a document expert examine the diary.)

Copeland's attorney also asked the court to compel production of anything in the diary relating to J.S.'s dissatisfaction with her life at home; the defense attorney argued that these passages might be relevant to the kidnapping charge. Judge Murphy subsequently ordered production of several other pages, but still not the entire diary.

On appeal, Copeland argues that more of the diary should have been disclosed to him. He notes that, on one of the diary pages he received, J.S. wrote: "I keep telling people that things happened with him and me when I was down there, but nothing did happen. I need to stop lying." Copeland suggests that there must be other pages that contain similar statements relevant to J.S.'s credibility. However, we have examined the diary and we agree with Judges Steinkruger and Murphy that there are no other portions that bear on this issue.

Copeland also argues that Judges Steinkruger and Murphy had no authority to bar him from seeing any portion of the diary because J.S. (the author of the diary) never personally asserted a right to privacy in the diary. Rather, it was the district attorney's office that invoked J.S.'s right to privacy. Copeland contends that, absent a personal request for privacy from J.S. herself, the

---

1. AS 11.41.300(a)(1)(F) and AS 11.41.436(a)(1), respectively.

2. AS 11.51.130(a).

superior court had no authority to prevent Copeland from obtaining the diary.

But this argument works both ways. It was obvious that J.S. could claim a right of privacy in her diary, and Copeland's attorney never asserted that J.S. was willing to waive that right of privacy, nor did he ask the superior court to pose this question to J.S.

In any event, we conclude that this issue is moot. In *Spencer v. State*, 642 P.2d 1371 (Alaska App.1982), this Court confronted this same argument: that a trial judge committed error by invoking a victim's right to privacy when the victim had not personally asserted that right. In *Spencer*, we concluded that any arguable error was harmless, since the trial judge had correctly concluded that the excluded information was not relevant. *Id.* at 1376.

We reach the same conclusion in Copeland's case. When the superior court declined to give Copeland access to the complete diary, the court did not rely on the theory that, even though the excluded portions were relevant, they were protected by an overriding right of privacy. Rather, the superior court concluded that these portions were not relevant. Having examined these portions of J.S.'s diary, we agree.

Next, Copeland argues that, given J.S.'s testimony that she altered certain portions of the diary, both the defense attorney and the jury were entitled to inspect the entire physical document to see if there was evidence of physical tampering. But as we explained above, when this issue surfaced at Copeland's trial, Judge Murphy offered to let a document examiner (chosen by the defense) examine the entire diary. This was a reasonable way of reconciling the competing interests—allowing the defense to investigate the possibility of physical alteration while at the same time preserving J.S.'s privacy in the content of the diary, to the extent that this content was irrelevant. Copeland chose not to pursue Judge Murphy's offer.

We therefore conclude that Judge Murphy committed no error when he revealed only parts of J.S.'s diary to the defense.

Finally, Copeland argues that he was prejudiced because, even though Judge Murphy released additional pages of the diary to the defense during Copeland's second trial, the defense should have had access to those same pages during Copeland's first trial. Copeland suggests that if Judge Steinkruger had released those extra pages to him during the first trial, the result of that first trial might have been different.

Copeland's argument is completely speculative. Without knowledge of these additional pages, Copeland's attorney was able to fight the State to a draw at the first trial: a hung jury on all but one count, and an acquittal on that one count. At the second trial, when the defense attorney had access to the extra pages of the diary, Copeland was convicted of nine counts of sexual abuse and also of contributing to the delinquency of a minor. We therefore conclude that Copeland has failed to show that he was prejudiced by Judge Steinkruger's narrower disclosure of the diary at the first trial.

 In a related argument, Copeland contends that Judge Murphy committed error by "testifying" about the diary. In his opening brief to this Court, Copeland asserts that, "rather than allow[ing] the jury and the defendant to examine the diary pages, the [trial] judge described from the bench ... what pages were missing from the diary, and on what pages mark-outs and erasures seemed to exist". Copeland argues that, by telling the jury these things, Judge Murphy "became a witness in the case he was judging".

But as the State pointed out in its responding brief, Copeland's appellate attorney failed to provide any transcript citations to support this claim of judicial misconduct. The State further asserted that, "[a]fter a thorough review of the record", the State was unable to identify "any portion of the trial where the court simply described evidence for the jury".

The event that most closely approximates Copeland's claim of misconduct occurred when photocopied pages of J.S.'s diary were admitted into evidence. These pages had been redacted when they were photocopied; they did not include portions of the diary that Judge Murphy had ruled were irrelevant. For this reason, when these pages

were introduced into evidence, Judge Murphy pointed out to the jurors that certain parts of these pages were missing, and he instructed the jurors not to speculate about the contents of the missing portions.

Copeland's reply brief omits any mention of this issue. We take this as a concession by Copeland's appellate attorney that his claim of judicial misconduct is not supported by the record.

█ We take this opportunity to remind Copeland's appellate attorney (and all attorneys) that under Alaska Civil Rule 11, "an attorney's signature on a document filed with a court constitutes the attorney's certificate that the assertions of fact contained in the document are well-grounded 'to the best of the signer's knowledge, information, and belief *formed after reasonable inquiry*'." [3] An attorney's good faith belief concerning the facts of the case is not enough to satisfy Civil Rule 11. Rather, an attorney is obliged to make objectively reasonable efforts to ascertain the facts of the case before making assertions of fact in court documents.[4]

*Copeland's argument that this Court should overrule or limit our decision in Covington v. State*

█ Copeland was convicted of nine counts of sexual abuse of a minor, each count alleging an act of sexual penetration with J.S. (who was under the age of 16). One of these counts alleged that the act of sexual penetration occurred on a specific day ("on or about September 12, 1996"), but the other counts alleged that the act of sexual penetration occurred during a particular month—or, in the case of one count, during a particular two months.

On appeal, Copeland argues that this lack of specificity in a charging document should not be allowed because it effectively precludes a defendant from asserting the defense of alibi. Copeland concedes that, in *Covington v. State*, 703 P.2d 436, 438–40 (Alaska App.1985), we addressed and rejected a similar contention. Nevertheless, Copeland argues that *Covington* was wrongly de-

cided and "fatally flawed". He urges us to overrule *Covington* outright, or at least declare that *Covington* will not apply when a defendant wishes to claim alibi.

Copeland's brief neglects to mention that he did not raise this claim in the superior court. More precisely, Copeland's attorney never told the trial judge that Copeland wished to pursue a defense of alibi and that, because of this, Copeland would arguably be prejudiced by the indictment's lack of specificity regarding the dates on which the acts of unlawful sexual penetration occurred.

Copeland's failure to raise this claim in the superior court means that he must demonstrate plain error to prevail on appeal. And Copeland's failure to offer evidence of alibi (or even make an offer of proof concerning a contemplated alibi defense) means that he can not show plain error.

Because the trial court record does not show that Copeland had an alibi defense to assert, Copeland is asking us to reverse his convictions based on speculation that (1) he might have pursued an alibi defense and that, had Copeland brought this problem to the attention of Judge Murphy, (2) the judge would have done nothing to require the State to describe the counts with more specificity—either by narrowing the dates of the various offenses, or by supplying other descriptive information that would have helped to identify those offenses with greater particularity.

In *Sam v. State*, 842 P.2d 596, 599 (Alaska App.1992), this Court declared that we will not engage in the exercise of trying to ascertain potential prejudice to a defendant "in a purely hypothetical or abstract context". Here, Copeland never relied on a defense of alibi, nor did he even make an offer of proof concerning a contemplated defense of alibi, nor did he seek relief from the trial judge. Thus, there is no indication in the record that Copeland was prejudiced by the arguable lack of specificity in the indictment. As we said in *Sam*, "[a]ny attempt to divine the likely effect of the alleged error in these

---

**3.** *Tyler v. State*, 47 P.3d 1095, 1100 (Alaska App. 2001) (emphasis in the original).

**4.** *Id.,* citing *Keen v. Ruddy*, 784 P.2d 653, 658 (Alaska 1989).

circumstances would amount to pure speculation." [5]

For this reason, we decline Copeland's invitation to re-examine *Covington,* and we find no plain error in the wording of the sexual abuse counts of the indictment.

*Copeland's argument that the jury's verdicts are not supported by sufficient evidence*

■ In a related argument, Copeland asserts that the nine counts of sexual abuse of a minor are worded with so little specificity that, even if the jury believed that Copeland engaged in sexual penetration with J.S. on one or more occasions, the jury could not possibly have determined that any particular count was proved beyond a reasonable doubt. Again, because Copeland did not raise this issue in the superior court, he must show plain error. We find none.

Count 4, which alleged an act of sexual abuse during December 1996, was supported by testimony that J.S. had sexual relations with Copeland "close to Christmas" when her roommates were out of town, and she and Copeland were able to borrow a bedroom.

Count 5, which alleged an act of sexual abuse during January 1997, was supported by testimony that J.S. stayed at the residence of Allen Funderburk for approximately a week in January 1997 and that she had sexual relations with Copeland "more than once" while she was staying with Funderburk.

Count 6, which alleged an act of sexual abuse during March 1997, was supported by testimony that J.S. had sexual relations with Copeland before and on Easter Sunday of that year (March 30, 1997).

Count 7, which alleged an act of sexual abuse during April 1997, was supported by testimony that, during April, Copeland brought pornographic videos to the apartment where J.S. was staying and that, after watching those videos, J.S. and Copeland engaged in sexual relations.

Count 8, which alleged an act of sexual abuse during May 1997, was supported by testimony that, during May, J.S. and Copeland had several arguments because J.S. wanted to go outside the apartment despite Copeland's concerns that J.S. would be recognized—and that after some of these arguments, J.S. and Copeland would reconcile by having sexual relations.

Count 9, which alleged an act of sexual abuse during June 1997, was supported by testimony that J.S. had sexual relations with an individual referred to as "Billy" on one occasion during June and that, sometime before and after this event, she engaged in sexual relations with Copeland.

Count 10, which alleged an act of sexual abuse during July 1997, was supported by testimony that J.S. and Copeland took a trip to Anchorage in July and that they engaged in sexual relations before and after this trip.

Count 11, which alleged an act of sexual abuse during August 1997, was supported by testimony that Copeland and J.S. drove to the State Fair and engaged in sexual relations after that trip.

Regarding these counts in which more than one act of sexual penetration might conceivably have been proved within the relevant time frame, Copeland's jurors were instructed that it was necessary for all twelve jurors to find that Copeland committed at least one act of sexual penetration with J.S. during the time period in question, and that it was further necessary for all twelve jurors to agree on the same act of sexual penetration.

Given the testimony and the jury instructions, we conclude that Copeland was accorded his right to a unanimous verdict on each count. There was no error, much less plain error.

*Copeland's claim that the trial judge improperly prevented him from introducing evidence that J.S. had falsely accused Copeland's son of engaging in sexual intercourse with her*

At Copeland's first trial, J.S. testified that she engaged in sexual relations with both Copeland and his son Joe during a trip from Fairbanks to Anchorage. Later in the trial,

**5.** *Sam,* 842 P.2d at 599.

Joe testified that he had not had sex with J.S. Copeland was ultimately acquitted of the charge relating to this incident—the one verdict that emerged from that first trial.

■ At Copeland's second trial, Copeland's attorney wanted to have Joe testify that J.S. had falsely accused him of having sexual relations with her. Judge Murphy found that this testimony was barred both by Alaska's rape shield law, AS 12.45.045, and by Alaska Evidence Rule 608, which allows attacks on a witness's character for truthfulness but limits these attacks to reputation or opinion evidence, prohibiting testimony relating to specific instances of untruthfulness.

At the time of Copeland's trial, the governing law on this issue was found in *Covington v. State*, 703 P.2d 436 (Alaska App.1985). In *Covington*, we held that evidence of a victim's false accusations of sexual misconduct would be admissible only if the proponent of the evidence first met a threshold burden of establishing the falsity of the past accusations—"as, for example, where the charges somehow had been disproved or where the witness had conceded their falsity". *Id.* at 442.

Since that time, we issued our decision in *Morgan v. State*, 54 P.3d 332 (Alaska App. 2002), where we clarified the *Covington* rule. *Morgan* holds that, before evidence of a prior false accusation of sexual misconduct can be admitted, the proponent of this evidence must convince the trial judge by a preponderance of the evidence that the prior accusation was both actually and knowingly false. *Id.* at 339.

Here, based on their testimony at Copeland's first trial, J.S. would assumedly have testified (if she was asked) that Joe Copeland had engaged in sexual relations with her, and Joe would have denied this. But this sort of "he said/she said" testimonial conflict does not satisfy the *Morgan* requirement that the prior accusation be proved false. Under *Morgan*, the proponent of the false accusation evidence must present more than simply the accused person's assertion of innocence— for as Judge Coats pointed out in his concur-

ring opinion in *Morgan*, "[w]e would expect someone who is accused of sexual assault to deny that the sexual assault occurred".[6]

As Judge Coats further noted in *Morgan*, "[e]ven if the prior sexual assault went to trial and the defendant was acquitted, all this proves is that the jury had a reasonable doubt that the sexual assault occurred."[7] In Copeland's case, there was not even a jury verdict on this issue—because Joe Copeland was never charged with sexually abusing J.S. It is true that the jury acquitted *Mark* Copeland of having sex with J.S. during the trip from Fairbanks to Anchorage, but the jury could have returned this verdict even if they were convinced that J.S. had indeed engaged in sexual relations with *Joe* Copeland during that same trip. That is, the assertion that Joe had engaged in sex with J.S. was collateral to the question the jury was asked to resolve.

In sum, Copeland's offer of proof on this issue—his assertion that Joe Copeland would testify that J.S. accused him of having sex with her during the trip from Fairbanks to Anchorage, and that this accusation was false—was insufficient to trigger the need for a hearing under *Morgan*.

In his reply brief, Copeland asserts that Joe's denial of sexual relations was supported by the testimony of Joe's younger sister. According to Copeland, the younger sister likewise testified that Joe never engaged in sex with J.S. But Copeland's attorney did not mention the sister's testimony when he asked Judge Murphy to allow him to introduce Joe Copeland's testimony. Moreover, Copeland's characterization of the sister's testimony is not accurate. The sister testified that she never observed her brother having sex with J.S. in the vehicle, but she did not deny that it had happened. (The sister testified that she was asleep for several hours.)

For these reasons, we uphold Judge Murphy's decision to preclude Copeland from introducing the proposed testimony of his son Joe.

---

**6.** *Morgan*, 54 P.3d at 340 (Coats, C.J., concurring).

**7.** *Id.*

*Copeland's claim that the trial judge improperly allowed a witness to give testimony suggesting that Copeland was involved in the sale of illegal drugs*

■ Copeland points out that, at his first trial, one of the witnesses gave testimony suggesting that Copeland was involved in the drug trade. But Copeland's first trial ended in a hung jury on all counts but one, and Copeland was acquitted of that one count. Copeland does not contend that this challenged testimony was repeated at his second trial. Therefore, Copeland's claim of error is moot.

*Copeland's claim that the prosecutor improperly called a witness to the stand when the prosecutor knew that the witness would claim the Fifth Amendment rather than answer the questions*

■ At Copeland's second trial, the prosecutor called Eddie Gray to the stand. The prosecutor was interested in Gray because, in March 1997, Gray rented an apartment in Fairbanks on behalf of "Ray Enoch"—an alias that Copeland used. Posing as "Ray Enoch", Copeland paid the rent on this apartment, and he installed J.S. there. (J.S. likewise used an assumed name while she lived there.)

During Gray's direct examination, the prosecutor asked him whether Copeland had access to the apartment. The following colloquy occurred:

> *Prosecutor:* Do you know Mark Copeland?
>
> *Gray:* Yes.
>
> *Prosecutor:* Did you give [a key to the apartment] to Mark Copeland?
>
> . . .
>
> *Gray:* I don't recall who we all gave the keys to.
>
> *Prosecutor:* Okay. How many people do you think you gave keys to?
>
> *Gray:* Several.
>
> *Prosecutor:* Okay. Why were you giving so many keys around?
>
> *Gray:* That's personal.

> *Prosecutor:* Please answer my question. Why were you passing so many keys out?
>
> *Gray:* I'll stand on the Fifth on that one.
>
> *Prosecutor:* I'm sorry?
>
> *Gray:* I'll stand on the Fifth on that one.

At this point, Judge Murphy dismissed the jury; he also appointed an attorney to advise Gray.

■ It is improper for an attorney to present a witness to the jury if the attorney knows that this witness will assert a valid privilege to refuse to answer questions.[8] In the present case, the prosecutor asserted that she had not known that Gray would claim the privilege against self-incrimination. Copeland's attorney told Judge Murphy that he wished to reserve the right to request a mistrial if a subsequent investigation revealed that the prosecutor had not been acting in good faith.

During the discussion of this point, the defense attorney contended that certain pretrial police interviews contained sufficient information to alert the prosecutor that Gray was likely to invoke the Fifth Amendment. The defense attorney also asserted that, during Copeland's first trial, there was testimony suggesting that Gray was involved in a "drug cartel". However, following this discussion, Copeland's attorney never again asked Judge Murphy to address this issue, and the defense attorney never requested a mistrial.

The defense attorney did, however, ask Judge Murphy to give a curative instruction to the jury. In response, the judge gave the following instruction:

> [Y]ou are to totally disregard, for any purpose of this trial, the response that the witness gave [when] he said that he invoked the Fifth. . . . [Y]ou may not consider that statement by that witness, whatever he meant by it, to indicate in any way any criminality or accusation against either Mr. Copeland or Mr. Gabayan [Copeland's co-defendant]. That was merely this witness's statement. And, again, you are not to consider it for any purpose of this case,

---

8. *See Williams v. State,* 600 P.2d 1092, 1093 (Alaska 1979).

and it has nothing whatsoever to do with any accusations in this case or charges against either of the defendants. . . .

[P]eople [watch] movies on TV, and they [hear] people say, "I invoke the Fifth", and often times they don't even know what they're saying. And, quite frankly, people do that when they haven't done anything wrong themselves. It's just a phrase they pick up. So, please, totally disregard it in its entirety.

Copeland never objected to the wording of this instruction.

Later, Judge Murphy reviewed tape recordings of the police interviews of Gray. Following this review, the judge informed the parties that Gray in fact did have a reasonable concern that he would incriminate himself if he answered the prosecutor's question. Judge Murphy also concluded that, even though the prosecutor may have hoped that Gray would not invoke the Fifth Amendment, the prosecutor should have instructed Gray that, if Fifth Amendment concerns arose during the examination, Gray should not expressly invoke the Fifth Amendment in front of the jury.

Nevertheless, Judge Murphy held that there had been no prosecutorial misconduct of sufficient severity to merit a mistrial—that any prejudice to the defendants had been corrected by the curative instruction already given to the jury. As noted above, Copeland never actually asked for a mistrial, nor did he seek an additional curative instruction or any other relief.

On appeal, Copeland contends that Judge Murphy should not have believed the prosecutor's protestation of good faith. He argues that if Judge Murphy could listen to the tapes of the pre-trial interviews and discern that there was a Fifth Amendment problem, the prosecutor must have been able to see this problem too.

This claim is not preserved for appeal. As already explained, as soon as this issue surfaced, Copeland's attorney told Judge Murphy that he wished to reserve the right to request a mistrial if a subsequent investigation revealed that the prosecutor had not been acting in good faith. But the defense attorney never returned to this issue. He never actually argued that the prosecutor had acted in bad faith, nor did he object or ask for reconsideration when Judge Murphy found that the prosecutor had acted in good faith.

In the alternative, Copeland contends that "given the highly prejudicial nature of [Gray's] invocation of [the] Fifth Amendment privilege", a curative instruction was insufficient to solve the problem and "the proper [course was] to declare an immediate mistrial".

Again, this claim is not preserved for appeal. Copeland's attorney never asked for a mistrial. Instead, he asked for a curative instruction. Judge Murphy gave the requested instruction, and Copeland's attorney never objected to the wording of this instruction. Copeland can not shift course now.

That being said, Copeland can still raise this issue as a claim of plain error. But to prevail on a claim of plain error, Copeland would have to show that no competent judge could have believed that the problem could be solved by steps short of a mistrial. Copeland has failed to adequately brief this claim. His sole argument on the issue of prejudice consists of the single conclusory sentence that we quoted two paragraphs above.[9]

Moreover, an appellate court will normally defer to a trial judge's decision concerning whether a particular reference to improper information can be cured with a clarifying or cautionary instruction or whether, instead, a mistrial is needed.[10] We defer to the trial judge because the judge "has the opportunity to hear the tainted evidence as it

---

**9.** *See Petersen v. Mutual Life Ins. Co. of New York,* 803 P.2d 406, 410 (Alaska 1990) (when a claim of error is supported by no more than "a cursory statement in the argument portion of the litigant's brief, the point will not be considered on appeal").

**10.** *Allen v. State,* 51 P.3d 949, 955 (Alaska App. 2002).

is presented and to observe the impact it has on the jury".[11]

Finally, we have repeatedly warned trial judges to be extremely cautious about granting a mistrial when the defendant has not sought one—because, under the double jeopardy clause, if a judge declares a mistrial *sua sponte* when there is no manifest necessity for it, the charges against the defendant must be dismissed.[12]

In light of this governing law, even if Copeland had adequately briefed the issue of prejudice, we would find no plain error. Copeland never disputed that he knew Gray, or that Gray had given him a key to the apartment rented on behalf of "Ray Enoch", or that he (Copeland) was the one paying the rent on the apartment. Thus, the question that Gray refused to answer did not concern a contested subject. Not only did this reduce the danger of prejudice from Gray's assertion of the Fifth Amendment, but it also made it more likely that the jury would follow Judge Murphy's cautionary instruction and disregard Gray's assertion of privilege.

In sum, there was no manifest necessity for a mistrial.

*Copeland's claim that his sentence is excessive*

■■■■ Copeland was convicted of contributing to the delinquency of a minor (a class A misdemeanor)[13] and nine counts of second-degree sexual abuse of a minor (a class B felony).[14] Because Copeland was a first felony offender convicted of class B felonies, his sentencing was governed by the benchmark ranges set forth in *State v. Jackson*, 776 P.2d 320, 326–27 (Alaska App.1989).

Under *Jackson*, a typical offender who has committed a typical to moderately aggravated offense should receive an unsuspended term of 1 year or more.[15] The upper limit in this category is 4 years' imprisonment, reflecting our decision in *Austin v. State*, 627 P.2d 657, 657–58 (Alaska App.1981).[16] For an offense that is exceptionally aggravated—*i.e.*, one that involves the existence of significant statutorily specified aggravating factors or other extraordinarily aggravated circumstances—a judge may impose up to 6 years to serve.[17]

For the nine counts of sexual abuse, Judge Murphy sentenced Copeland to a composite sentence of 10 years' imprisonment with 3 years suspended—*i.e.*, 7 years to serve. For the additional offense of contributing to the delinquency of a minor (*i.e.*, aiding, inducing, or encouraging J.S. to leave the custody of her parents without their knowledge or consent), Judge Murphy sentenced Copeland to serve a consecutive term of 1 year's imprisonment. Thus, Copeland's composite sentence is 11 years with 3 years suspended—*i.e.*, 8 years to serve.

Obviously, this sentence exceeds the *Jackson* benchmark range of sentences for exceptionally aggravated offenses. However, as we have pointed out in the past, a benchmark range is not a hard-and-fast limit on a judge's sentencing authority. Rather, a benchmark range can be exceeded if there is a sound reason to differentiate the defendant's case from the typical cases encompassed in that benchmark range.[18]

For example, in *Davis v. State*, 793 P.2d 1064 (Alaska App.1990), we approved a sentence of 10 years to serve for a first felony offender convicted of multiple counts of second-degree sexual abuse of a minor. We noted that Davis's offenses would qualify as "exceptionally aggravated" under the *Jackson* guidelines for "several independent [reasons]".[19] Because "[a]ny of these factors tak-

---

11. *Brown v. State*, 693 P.2d 324, 327 (Alaska App.1984).

12. *Cook v. State*, 36 P.3d 710, 729 (Alaska App. 2001).

13. AS 11.51.130(b).

14. AS 11.41.436(b).

15. *Jackson*, 776 P.2d at 326.

16. *Jackson*, 776 P.2d at 326.

17. *Id.*

18. *See Brown v. State*, 973 P.2d 1158, 1162 (Alaska App.1999); *Williams v. State*, 809 P.2d 931, 934 (Alaska App.1991).

19. *Davis*, 793 P.2d at 1066.

en alone" would have placed Davis's case within *Jackson's* "exceptionally aggravated" category, we concluded that Davis could properly receive a sentence greater than the 4– to 6–year range set forth in *Jackson* for exceptionally aggravated cases.[20]

When Judge Murphy sentenced Copeland, he expressly acknowledged the *Austin* decision and the *Jackson* benchmarks. The judge concluded that he should exceed these benchmarks because Copeland was a "worst offender".

Judge Murphy concluded that Copeland was a worst offender based on (1) the number of Copeland's acts of intercourse with J.S.; (2) the length of time during which Copeland carried on his illicit relationship with the teenager; (3) the emotional harm that Copeland inflicted on both J.S. and her family; (4) Copeland's deviousness in "driv[ing] a wedge" between J.S. and her family so that he could obtain sexual gratification; culminating in (5) Copeland's scheme to hide J.S. from her family and, at the same time, control her. In addition, Judge Murphy noted that Copeland continued to insist that he never engaged in sex with J.S., but only tried to help the girl. Accordingly, based on the totality of the circumstances, Judge Murphy concluded that Copeland's prospects for rehabilitation were "guarded" or "poor".

We note that even though Judge Murphy found that Copeland was a worst offender, the judge did not impose a composite sentence equal to the 10–year maximum term that Copeland might have received for second-degree sexual abuse of a minor. Rather, Judge Murphy sentenced Copeland to a composite term of 8 years to serve, encompassing the nine counts of second-degree sexual abuse and the count of contributing to the delinquency of a minor.

We acknowledge that Copeland's sentence is among the most severe reported sentences for defendants convicted of second-degree sexual abuse of a minor. But within this category, Copeland's offense is unusually ser-

ious. Judge Murphy explained why he believed that Copeland's sentence should exceed the normal benchmark ranges, and the record supports the judge's explanation. For this reason, we can not say that Copeland's composite 8 years to serve is clearly mistaken. Accordingly, we affirm the sentence.[21]

*Conclusion*

The judgement of the superior court is AFFIRMED.

**20.** *Id.*

**21.** *See McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974) (an appellate court is to uphold a

sentencing decision unless the sentence is clearly mistaken).