Frederick L. NED Jr., Appellant,

v.

STATE of Alaska, Appellee.

No. A–8721.

Court of Appeals of Alaska.

Aug. 19, 2005.

Rehearing Denied Sept. 9, 2005.

---

Marcia E. Holland, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for the Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

### OPINION

MANNHEIMER, Judge.

Frederick L. Ned Jr. was convicted of manslaughter and sentenced to 10 years' imprisonment with 3 years suspended (7 years to serve). In this appeal, Ned claims that the police obtained a statement from him in violation of his rights under *Miranda v. Arizona.*[1] He also claims that his sentence is illegal in two respects. First, Ned argues that he was denied his Sixth Amendment right to jury trial, as construed in *Blakely v. Washington,*[2] on some of the questions of fact that the State was required to prove in order to support the judge's sentencing decision. Second, Ned argues that the sentencing judge exceeded the scope of permissible

---

**1.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**2.** 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

restitution when the judge required Ned to reimburse the cost of air fare for several people to attend the victim's funeral; these people were related to the victim, but not closely enough to qualify as victims of the offense under AS 12.55.185(17)(C).

For the reasons explained here, we conclude that Ned was not in custody when he gave his statement to the police, and therefore there was no *Miranda* violation. With regard to Ned's sentence, we conclude that, consistent with *Blakely*, the sentencing judge could impose the applicable presumptive term of 7 years to serve. However, as we explain here, the judge violated state law—specifically, AS 12.55.155(e)—when he relied on aggravating factor AS 12.55.155(c)(4) to add an additional 3 years of suspended jail time to Ned's sentence. We therefore vacate those 3 suspended years. Finally, we agree with Ned that he should not have been ordered to reimburse the cost of the air fare for the people to attend the funeral.

*Underlying facts pertaining to the Miranda issue, and our resolution of this issue*

On the afternoon of August 28, 2002, in Allakaket, Frederick Ned and Brett Stevens decided to go for a drive in Ned's father's pickup truck. The truck was in a state of disrepair: it had no driver's side door, the truck's front tires were of different sizes, the truck's front brakes and emergency brake were inoperable, and its rear brakes were badly worn. Both Ned and Stevens had been drinking heavily the night before and earlier that morning. Ned was driving the truck, and Stevens was riding in the passenger seat.

Ned went to the Allakaket airport and drove onto the runway. The airport runway ends in an embankment with a 20–foot drop to the marshes below. Ned launched the truck off the end of the runway. The truck traveled about 15 to 20 feet through the air and landed upside-down. Ned was uninjured, but Stevens was killed.

The Alaska State Troopers were contacted, and two troopers—Sergeant Scott R. Grasle and Trooper Karl R. Main—arrived in Allakaket approximately four hours after the accident. Upon their arrival, the troopers briefly visited the site of the accident. Witnesses informed them that Ned had been driving, and that he appeared intoxicated. Then, a few minutes before 8:00 in the evening, the troopers went to Ned's house to speak to him.

Eliza Ned, Frederick's mother, answered the door. When the troopers informed Mrs. Ned that they wanted to speak to her son, Frederick, she told them that he was asleep, and she directed them to the bedroom where Ned was sleeping.

Trooper Main stood by the bedroom door while Sergeant Grasle went to Ned's bed and woke him up by calling his name. When Ned awoke, the troopers asked if they could talk to him. Ned told the troopers that he needed to put on some clothes, so Grasle left the room and the two troopers waited in the hallway, talking to Mrs. Ned, while Ned dressed.

While the troopers were standing in the hallway, Ned said something to them, apparently asking what the troopers wanted to talk about, and Grasle responded, "Yeah, about the ... car accident." Ned asked, "Where?", and Grasle replied, "At the end of the runway."

When Ned emerged from the bedroom, Grasle again asked Ned, "Can we talk to you?", and then the troopers accompanied Ned down the hall to the living room, where they sat down. At this point, the troopers began questioning Ned about the accident at the airport. Ned contends that he was in custody during this interview in his living room, and that therefore the troopers were obliged to warn him of his rights under *Miranda*.

Superior Court Judge Mark I. Wood, who conducted the evidentiary hearing into this matter, found that although the troopers assured Ned's mother that they had not come to arrest him, the troopers never explicitly said this to Ned until toward the end of the interview, and the troopers never told Ned that he was under no obligation to speak to them. Nevertheless, Judge Wood concluded that, under the circumstances, a reasonable person in Ned's position would have believed that he was free to end the conversation.

Judge Wood pointed out that the troopers did not roust Ned from his bed; rather, they woke him up by calling his name, and then they asked if they could speak to him. When Ned indicated a desire to dress, the troopers left the bedroom and conversed with his mother in the hallway while Ned dressed. The judge further found that, when Ned and the troopers walked to the living room, the troopers took seats at the far end of the room, while Ned seated himself on the couch, close to the door. In other words, as Judge Wood explained, "there was no trooper standing between [Ned] and the door".

Judge Wood further noted that the interview took place in mid-evening in the summer, when people were normally up and about, and that Ned's mother came in and out of the room during the troopers' conversation with her son. In fact, as Judge Wood found, Trooper Main was the one who primarily conducted the interview; Sergeant Grasle asked a few questions, but he too (like Ned's mother) "was in and out [of the room], . . . [not] hovering around".

Judge Wood also found that the tone of the interview was polite, and that the questions that the troopers addressed to Ned were non-accusatory. The judge concluded that "[t]he pace of the interview, the nature of the questions, [and] the tone of the interview all indicated that the troopers were just . . . trying to get through a very difficult time in a very polite and considerate tone". Judge Wood found that the circumstances of the interview carried "none of the indication[s] and concerns that the . . . *Miranda* court had about . . . heavy-handed interrogation and coercion". Instead, the interview was conducted in a "most casual, relaxed atmosphere", and the troopers "were patient in listening to his answers". According to Judge Wood, the non-custodial tenor of the interview was corroborated by the fact that, even though Ned admitted that he had been quite intoxicated when he drove the car (during the interview, some five hours after the incident, Ned described himself as still being "7" on a scale of 1 to 10), the troopers did not arrest Ned at the end of the interview; instead, they left his house.

We have reviewed the audio tape of the troopers' visit to Ned's house, as well as the testimony presented at the evidentiary hearing, and we find that this record supports Judge Wood's characterization of what occurred. Based on these facts, we agree with Judge Wood that Ned was not in custody for *Miranda* purposes during the interview at his house.

*Ned's claims based on Blakely v. Washington: underlying facts*

Ned was a first felony offender. His offense, manslaughter, is a class A felony.[3] Under AS 12.55.125(c), a first felony offender convicted of manslaughter faces a presumptive term of 5 years' imprisonment unless their offense falls within the circumstances enumerated in AS 12.55.125(c)(2)(B) or (2)(C), in which case the applicable presumptive term is 7 years.

In Ned's case, the State asserted that Ned's offense fell within subsection 125(c)(2)(C). This subsection applies when "the conduct resulting in the [defendant's] conviction [for manslaughter] involved driving while under the influence of an alcoholic beverage". Ned's attorney filed a responsive pleading in which the defense attorney acknowledged that the State was correct—that Ned was subject to sentencing under subsection (2)(C). And, because the parties agreed that Ned was subject to the 7-year presumptive term specified in subsection (2)(C), Judge Wood sentenced Ned on this basis.

Ned's attorney also conceded the applicability of one aggravating factor under AS 12.55.155(c): (c)(4)—that Ned employed a dangerous instrument (a motor vehicle) in committing the offense. Based on aggravator (c)(4), Judge Wood increased Ned's sentence by adding 3 suspended years to the 7-year presumptive term. Thus, Ned's final sentence was 10 years with 3 years suspended.

Now, on appeal, Ned (represented by a different attorney) contends that this procedure violated his Sixth Amendment right to jury trial as construed in *Blakely v. Wash-*

---

**3.** AS 11.41.120(b).

*ington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Ned actually makes two *Blakely* arguments, both of them contained in a single conclusory sentence.

First, Ned asserts that even though his trial attorney expressly conceded the fact that triggered the 7–year presumptive term (*i.e.,* that Ned committed manslaughter while he was driving under the influence) and also conceded the applicability of aggravator (c)(4) (*i.e.,* that Ned's offense involved the use of a dangerous instrument), the sentencing judge was not authorized to rely on the defense attorney's concessions. Ned argues that, because the right to jury trial was at stake, the sentencing judge was required to address Ned personally and obtain Ned's personal and knowing waiver of jury trial regarding both of these facts.

Second, Ned asserts that even if he *had* personally waived the right to jury trial and *had* personally conceded (a) that he was driving under the influence and (b) that his offense involved the use of a dangerous instrument, this would not have been enough. Ned argues that, because *Blakely* holds that he had a right to ask for a jury trial on these issues, he must also be accorded the right to a grand jury indictment on these issues. Ned points out that his grand jury was never asked to consider these issues. Because of this, Ned contends that the sentencing judge had no authority to impose the higher presumptive term or to enhance Ned's presumptive term based on aggravator (c)(4).

*Ned's claims are waived because they are inadequately briefed*

■ As we noted above, both of Ned's arguments are contained in a single concluso-

ry (albeit lengthy) sentence.[4] This Court and the Alaska Supreme Court have repeatedly held that arguments presented in this sort of conclusory manner are inadequately briefed, and are therefore waived.[5]

*Even if Ned's claims had not been waived, there was no plain error when Judge Wood applied the 7–year presumptive term, based on a finding that Ned committed the homicide while driving under the influence*

■ Even if Ned's arguments regarding the applicability of the 7–year presumptive term had not been waived on account of his inadequate briefing, we would still find no reversible error.

In the superior court, Ned raised no claim concerning his right to jury trial or his right to a grand jury decision as to whether he killed Stevens while he was driving under the influence, or as to whether the State could prove aggravator (c)(4). Therefore, if Ned is to prevail in this appeal, he must show plain error.

We turn first to Ned's claim that he was entitled to a jury trial on the fact that triggered the higher presumptive term under AS 12.55.125(c)(2)(C)—the fact that he committed the homicide while he was driving a motor vehicle under the influence.

Under Alaska law (even before the *Blakely* decision), if Ned had contested this fact, the State would have been obliged to prove this fact beyond a reasonable doubt.[6] This is the same burden of proof that *Blakely* requires. Thus, if Alaska sentencing law departed from *Blakely,* it did so only in one respect—that the finder of fact was the sentencing judge rather than a jury.

4. "Here[,] Mr. Ned was sentenced to an enhanced presumptive [term] without being provided with his state and federal right to have a jury determine by a unanimous verdict proved beyond a reasonable doubt that the factor used to establish the enhanced presumptive [term] of seven years [*sic:* this clause ends without a predicate], and without his state grand jury right to have the grand jury consider all elements of any felony offense, and without the court obtaining a personal waiver from Mr. Ned that he waived these constitutional entitlements." (Appellant's Opening Brief, page 13.)

5. *Katmailand, Inc. v. Lake and Peninsula Borough,* 904 P.2d 397, 402 n. 7 (Alaska 1995); *Petersen v. Mutual Life Ins. Co. of New York,* 803 P.2d 406, 410 (Alaska 1990); *Wren v. State,* 577 P.2d 235, 237 n. 2 (Alaska 1978); *Kristich v. State,* 550 P.2d 796, 804 (Alaska 1976); *Sheridan v. Anchorage,* 100 P.3d 898, 900–01 (Alaska App. 2004); *Guerre–Chaley v. State,* 88 P.3d 539, 544–45 (Alaska App.2004); *Copeland v. State,* 70 P.3d 1118, 1126 (Alaska App.2003).

6. *See Tuttle v. State,* 65 P.3d 884, 891 (Alaska App.2002); *Huf v. State,* 675 P.2d 268, 273–74 (Alaska App.1984).

The United States Supreme Court has ruled that constitutional errors involving a defendant's Sixth Amendment right to jury trial are not automatic grounds for reversal of a criminal conviction. Rather, courts must apply a harmless error analysis when assessing the effect of Sixth Amendment errors.

For instance, the case of *Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), involved a defendant who was convicted of perjury under the federal statute. At the defendant's trial, the judge removed the "materiality" element of perjury from the jury's consideration and decided this element himself. The Supreme Court held that even though the judge's action clearly violated the defendant's right to a jury trial under the Sixth Amendment, the defendant was still obliged to prove plain error—*i.e.,* to prove that the judge's error substantially prejudiced her.[7] The Supreme Court then held that, because the materiality of the defendant's particular false statement was undisputed, the defendant had failed to show prejudice, and thus the Court ruled that her perjury conviction should stand.[8]

In *United States v. Cotton,* 535 U.S. 625, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002), the Supreme Court applied a similar analysis to an *Apprendi* error. The defendants in *Cotton* were indicted for, and ultimately convicted of, conspiring to distribute (and to possess with intent to distribute) a "detectable" amount of cocaine. Federal law prescribed a penalty of up to 20 years' imprisonment for possession of a "detectable" amount of cocaine with intent to distribute. However, at sentencing, the federal judge found (based on testimony presented at the trial) that the defendants had actually possessed more than two kilograms of cocaine base. On the basis of this finding, the judge sentenced the defendants to 30 years' imprisonment under a separate statute that provided much higher penalties (up to life in prison) for drug offenses involving more than 50 grams of cocaine base.[9]

The defendants did not object to the fact that the judge increased their sentences based on a fact that was not found by the jury. However, while the defendants' case was on appeal, the Supreme Court decided *Apprendi v. New Jersey.*[10] In *Apprendi,* the Court held that "any fact that increases the penalty for the crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[11]

Based on *Apprendi,* the government in the *Cotton* appeal conceded that the sentencing judge had violated the defendants' Sixth Amendment right to jury trial. However, the Supreme Court applied the same harmless error analysis that it had applied in *Johnson v. United States* and, using that analysis, concluded that the *Apprendi* error did not require reversal of the defendants' sentences.

The Court noted that "[t]he evidence that the [defendants'] conspiracy involved at least 50 grams of cocaine base was overwhelming and essentially uncontroverted."[12] Thus, the Court reasoned, any fact finder who concluded that the conspiracy existed "[s]urely ... would have also found that the conspiracy involved at least 50 grams of cocaine base."[13] The Court therefore concluded that it was not plain error for the judge to impose the enhanced sentence. Rather, the Court declared, it would be a threat to the "fairness, integrity, and public reputation of judicial proceedings" if, because of a procedural error that the defendants did not object to, the defendants were to be granted a reduction of their sentences to the levels prescribed for

7. *Johnson,* 520 U.S. at 466–67, 117 S.Ct. at 1548–49.

8. *Id.,* 520 U.S. at 468–470, 117 S.Ct. at 1549–1550.

9. *Cotton,* 535 U.S. at 628, 122 S.Ct. at 1783–84.

10. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

11. *Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2362–63.

12. *Cotton,* 535 U.S. at 633, 122 S.Ct. at 1786 (quoting *Johnson,* 520 U.S. at 470, 117 S.Ct. at 1544).

13. *Id.,* 535 U.S. at 633, 122 S.Ct. at 1786.

much less serious drug offenses.[14]

Like the defendants in *Johnson* and *Cotton*, Ned also asserts that his sentencing judge violated his right to jury trial under the Sixth Amendment. We must therefore engage in a harmless error analysis.

Under Alaska sentencing law at the time of Ned's offense and sentencing, he faced a 5–year presumptive term for manslaughter unless the State proved that Ned's homicidal conduct involved driving under the influence, in which case Ned faced a 7–year presumptive term. We assume, for purposes of argument, that *Blakely* applies to this situation, and that Ned was therefore entitled to a jury trial on this issue of fact. However, under *Johnson* and *Cotton*, Ned is not entitled to reversal of his sentence unless he can show that he was prejudiced by this error. At a minimum, Ned must show that there is a reasonable possibility that the decision on the specified issue of fact would have been different if *Blakely* had been complied with.

As we noted above, even at the time of Ned's sentencing (*i.e.*, before the *Blakely* decision), Alaska law required the State to prove any fact that triggered a higher presumptive term beyond a reasonable doubt. We can therefore infer, from the defense attorney's pre-sentencing concession of this issue, that the defense attorney concluded that the evidence in Ned's case established beyond a reasonable doubt that Ned had killed Stevens while driving under the influence.

The record shows that, even at the start of Ned's trial, his defense attorney had already concluded that it was pointless to dispute the fact that Ned was driving under the influence at the time of the homicide. Neither in her opening statement nor in her summation did Ned's attorney dispute (1) that Ned was driving the truck when Brett Stevens was killed, and (2) that Ned was intoxicated at the time. Moreover, the evidence presented at Ned's trial provides ample support for both of these conclusions. With regard to Ned's level of intoxication, here is a summary of the evidence:

Ned's uncle, Vincent Simon, testified that he saw Ned driving the truck shortly before the accident, and that when he saw Ned immediately after the accident, Ned appeared intoxicated. Eliza Ned (Ned's mother) testified that when Ned came home after the accident, she could tell he had been drinking, and that he was drunk. Trooper Karl Main testified that, during his interview with Ned (some four to five hours after the homicide), he asked Ned how drunk he was on a scale of 1 to 10. Ned replied that he was currently a "7", and that he had been a "13" the night before.

Finally, the State presented testimony from an expert who had analyzed a blood sample that Ned gave to the troopers at the conclusion of his interview. This expert testified that Ned's blood alcohol level at the time of his interview with the troopers was .232 percent—that is, nearly three times the concentration of alcohol that would support a conviction for driving under the influence (.08 percent).

Based on this record, we conclude that the evidence was overwhelming and essentially uncontroverted that Ned's blood alcohol level was at least .08 percent at the time of the accident—and that, therefore, Ned was driving under the influence as that offense is defined in AS 28.35.030(a)(2). Ned has failed to show that there is any reasonable possibility that the decision on this question would have been different if the issue had been tried to a jury.

Thus, even assuming that it was constitutional error under *Blakely* for Judge Wood to decide this issue (rather than having a jury decide it), Ned has failed to show "plain error" because he has failed to show a reasonable possibility that he was prejudiced by the error.

■ For similar reasons, we conclude that Ned has failed to show plain error with respect to his claim that he was entitled to a grand jury indictment on this factual issue.

The federal Fifth Amendment right to grand jury indictment does not apply to the states; it is not a component of the due process of law guaranteed by the Fourteenth

---

14. *Id.*, 535 U.S. at 634, 122 S.Ct. at 1787.

Amendment.[15] And Ned cites no authority to support his assertion that the *Blakely* right to jury trial (a right founded on the Sixth Amendment to the United States Constitution) triggers a corresponding right to grand jury indictment under the Alaska Constitution. Finally, given the facts of Ned's case, there is no reasonable possibility that a grand jury, presented with these facts, would have found in Ned's favor on the issue of whether he was driving under the influence when he killed Stevens.

*Despite the fact that Ned waived his Blakely attack on aggravator (c)(4) by inadequately briefing the issue, there is an obvious independent ground under Alaska law for vacating the sentence enhancement that Ned received on account of this aggravator*

■ As we explained above, Ned's attorney conceded, and Judge Wood found, that aggravator AS 12.55.155(c)(4) applied to Ned's case because Ned employed a dangerous instrument—*i.e.,* a motor vehicle—when he committed the manslaughter.

As we also explained above, Ned's *Blakely* attack on aggravator (c)(4) is inadequately briefed and is therefore waived. However, the *Blakely* issue is ultimately moot. The superior court's enhancement of Ned's sentence based on aggravator (c)(4) was improper for an altogether separate reason.

Aggravator (c)(4) declares that an offense is aggravated if the defendant employed a dangerous instrument in committing the offense. In Ned's case, the dangerous instrument was a motor vehicle, and it was obvious that this aggravator applied.[16]

But AS 12.55.155(e) declares that there are two circumstances in which a sentencing judge is prohibited from relying on an applicable aggravating factor to enhance a defendant's presumptive term. The first circumstance is when the aggravating factor "is a necessary element of the ... offense" for which the defendant is being sentenced. The second circumstance is when the presence of

the aggravating factor "requires the imposition of a presumptive term under AS 12.55.125(c)(2)".

Ned's case is an example of this second circumstance. Ned was sentenced to one of the presumptive terms specified in AS 12.55.125(c)(2). In particular, Ned was subject to a 7-year presumptive term under subsection (c)(2)(C) because he committed manslaughter while he was driving a motor vehicle under the influence. Because Ned's use of a motor vehicle was a necessary element of the State's proof that Ned was subject to this 7-year presumptive term, Judge Wood was prohibited from relying on aggravator (c)(4) to enhance Ned's sentence based on this same fact.

For this reason, Ned's *Blakely* attack on aggravator (c)(4) would be moot even if it had not been waived. As a matter of state law, AS 12.55.155(e) forbade the use of aggravator (c)(4) to enhance Ned's sentence.

Aggravator (c)(4) was the sole aggravating factor that Judge Wood found to be proved. Thus, without aggravator (c)(4), Judge Wood had no authority to impose a sentence that exceeded the 7-year presumptive term.[17] We accordingly vacate the 3 years of suspended imprisonment that Judge Wood added to Ned's sentence based on this aggravator.

*The challenged restitution order*

■ Many of Brett Stevens's out-of-town relatives flew to the village of Evansville to attend his funeral. As part of Ned's sentence, Judge Wood ordered Ned to pay restitution for the money spent on these air fares.

Ned points out that many of these relatives were not so closely related to Stevens as to fall within the definition of "victim" contained in AS 12.55.185(17)(C). This statute, which defines "victim" for purposes of homicide cases, states that a victim is "a person living in a spousal relationship with the deceased before the deceased died, [or]

**15.** *See Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884).

**16.** *See, e.g., Pusich v. State,* 907 P.2d 29, 34 (Alaska App.1995).

**17.** AS 12.55.125(c).

an adult child, parent, brother, sister, grandparent, or grandchild of the deceased, [or] any other interested person [who has been] designated by a person having [legal] authority to [make the designation]".

Ned was ordered to pay the air fares of various family members who attended Stevens's funeral; some of these family members fall within the statutory definition of "victim", and some do not. On appeal, Ned concedes that Judge Wood could properly order him to pay restitution for the travel expenses incurred by family members who qualify as "victims" under the statute. But Ned argues that it was improper to order him to pay the travel expenses of other, more distantly related relatives, or the travel expenses of friends. Ned contends that these expenses were not a sufficiently direct consequence of a homicide.

The State responds to Ned's argument by pointing out that, under AS 12.55.045(a), restitution is not strictly limited to victims. Rather, a sentencing court is authorized to order the defendant to pay restitution "to the victim or other person injured by the offense". And the State points out that the air fares in dispute here were real, quantifiable expenses which, but for Ned's crime, would not have been incurred.

As the parties acknowledge, there are few decisions from other states on this point, and those decisions are split. Some courts have upheld restitution for travel expenses incurred by relatives of the deceased, especially when that travel was necessary not only to attend the funeral but also to put the deceased's affairs in order.[18] However, other courts have concluded that the travel expenses of relatives are too indirect a consequence of a homicide.[19]

It is true that, but for Ned's act of homicide, there would have been no need to hold a funeral, and thus no need to expend money on travel expenses to attend that funeral. Judge Wood relied on this fact when he imposed the contested restitution.

But even in a civil lawsuit for wrongful death, the test for determining the defendant's liability for damages is not a "but for" test, but rather a "proximate cause" test. AS 09.55.580(b) declares: "The damages recoverable [in an action for wrongful death] shall be limited to those which are the natural and proximate consequence of the negligent or wrongful act or omission of another." In other words, some expenses are simply too indirectly related to the wrongful homicide to qualify for reimbursement.

By analogy, we conclude that the test for awarding restitution in a criminal case is not a "but for" test. If this were the test—if a defendant's liability for restitution extended to any and all expenses that could be traced causally to the defendant's wrongful act— then the scope of restitution in a criminal case would exceed the scope of damages that could lawfully be awarded in a wrongful death lawsuit based on the same conduct. It is true that, in past decisions, we have recognized that the purpose of the restitution statutes is "[to] make full restitution available to all persons who have been injured as a result of criminal behavior, to the greatest extent possible".[20] Nevertheless, we do not think that the legislature intended for restitution in criminal cases to exceed the restitution that could be awarded in related civil cases.

Ned does not contest that the restitution statute allows a sentencing judge to order the defendant to repay the reasonable expenses of the funeral itself. And, as we noted previously, there are court decisions which uphold awards of restitution for the travel expenses of relatives or personal representatives who must settle or attend to the affairs of the deceased. But we have found no cases in which restitution has been awarded for all of the money spent to bring the deceased's friends and relatives to the funeral.

We acknowledge that these travel expenses are real and verifiable. And in some cases, unquestionably, these expenses are a

---

18. *See, e.g., State v. Baltzell,* 175 Ariz. 437, 857 P.2d 1291, 1292–93 (Ariz.App.1992).

19. *See, e.g., Simpson v. State,* 712 So.2d 1, 1–2 (Fla.App.1997).

20. *Lonis v. State,* 998 P.2d 441, 447 n. 18 (Alaska App.2000).

hardship to the people who pay them. But we have significant doubt whether the travel costs of all family members and friends are a sufficiently direct result of the defendant's crime to qualify for restitution. In other words, we have significant doubt whether the legislature intended for the defendant's liability to be this broad. And, because we are dealing with a question of criminal liability, we must resolve our doubt in favor of the defendant.[21]

As explained above, Ned does not contest his liability for the travel expenses of those relatives who qualify as "victims" under AS 12.55.185(17)(C). For this reason, we need not decide whether this portion of Ned's restitution order was lawful. However, we vacate the portion of the order directing Ned to pay restitution for the expense of bringing other relatives and friends to the funeral.

*Conclusion*

Ned's conviction is AFFIRMED. Moreover, we uphold the superior court's decision that Ned was subject to a 7–year presumptive term of imprisonment. However, we VACATE the 3 years of suspended imprisonment that the superior court added to this presumptive term. In addition, we VACATE the portion of the judgement that directs Ned to pay restitution for the travel expenses of relatives and friends of Brett Stevens who do not qualify as victims under the definition contained in AS 12.55.185(17)(C).

**21.** *See Brookins v. State*, 600 P.2d 12, 17 (Alaska 1979); *Wells v. State*, 102 P.3d 972, 976 (Alaska App.2004); *Whitesides v. State*, 88 P.3d 147, 151 (Alaska App.2004); *State v. ABC Towing*, 954 P.2d 575, 579 (Alaska App.1998); *Magnuson v. State*, 843 P.2d 1251, 1253 (Alaska App.1992); *State v. Andrews*, 707 P.2d 900, 907–08 (Alaska App.1985); *State v. Rastopsoff*, 659 P.2d 630, 640 (Alaska App.1983).